COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Felton and Kelsey
Argued at Salem, Virginia


CENTRAL VIRGINIA OBSTETRICS &
 GYNECOLOGY ASSOCIATES, P.C., AND
 KWASI A. DEBRA, M.D.

v.          Record No. 0399-03-2

LAWANDA P. WHITFIELD, Administratrix of                        OPINION BY
 the ESTATE OF DEJUAN L. WHITFIELD-SMITH          JUDGE D. ARTHUR KELSEY
                                                                              JANUARY 13, 2004

CHIPPENHAM & JOHNSTON-WILLIS HOSPITAL, INC.

v.          Record No. 0400-03-2

VIRGINIA BIRTH-RELATED NEUROLOGICAL
 INJURY COMPENSATION PROGRAM


             FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

        Kathleen M. McCauley; Linda B. Georgiadis; (Michael L. Goodman;
        Anthony Tacconi; Matthew D. Joss; Goodman, Allen & Filetti, PLLC;
        LeClair Ryan, on briefs), for appellants.

        William C. Carr, Jr. (Emroch & Kilduff, L.L.P., on brief), for appellee
        Lawanda P. Whitfield, Administratrix of the Estate of Dejuan L.
        Whitfield-Smith, Deceased.

        Scott John Fitzgerald, Assistant Attorney General (Jerry W. Kilgore,
        Attorney General; Judith Williams Jagdmann, Deputy Attorney General;
        Edward M. Macon, Senior Assistant Attorney General, on brief), for
        appellee Virginia Birth-Related Neurological Injury Compensation
        Program.


        Dejuan Whitfield-Smith died within a couple of hours after his birth.  His estate filed a

malpractice action in Richmond Circuit Court against Chippenham & Johnston-Willis Hospital,

Inc., Central Virginia Obstetrics & Gynecology Associates, P.C., and Kwasi A. Debra, M.D.  In

defense of this claim, the defendants asserted statutory tort immunity under the Virginia

Birth-Related Neurological Injury Compensation Act, Code §§ 38.2-5000 to 38.2-5021. As the Act requires, the circuit court referred the question to the Virginia Workers' Compensation Commission. After hearing conflicting medical evidence, the commission held that the Act did not apply to Dejuan's injury and thus did not afford statutory immunity to the tort defendants. The defendants, appellants in this consolidated appeal, seek our review of the commission's decision. They contend that the commission misapplied the burden of proof and made insupportable factual findings. Disagreeing with both contentions, we affirm.

I.

On appeal, we view the evidence in the light most favorable to the prevailing party before the commission. Clinchfield Coal Co. v. Reed, 40 Va. App. 69, 72, 577 S.E.2d 538, 539 (2003); Tomes v. James City (County Of) Fire, 39 Va. App. 424, 429, 573 S.E.2d 312, 315 (2002).

Lawanda Whitfield gave birth to an infant son, Dejuan Whitfield-Smith, at Chippenham Medical Center on December 30, 1998. Dr. Kwasi Debra, an obstetrician, used forceps extraction during the delivery. When Dejuan emerged from the birth canal, his nuchal cord was wrapped tightly around his neck.

After being cut free, Dejuan remained in severe respiratory distress. His Apgar scores were 1 at one minute, 0 at five minutes, and 0 at ten minutes.[1] Dr. Debra pronounced Dejuan dead in the delivery room and handed him over to his mother. Dejuan's mother noticed, however, that he appeared to be gasping for breath. A nurse also noted that Dejuan was moving his arms and legs.

---

[1] The Apgar rating scale ranges from 1 to 10. It provides a numerical expression of a newborn's condition that assesses heart rate, respiratory effort, muscle tone, reflex, irritability, and color. See generally Gaalaas v. Morrison, 233 Va. 148, 150 n.2, 353 S.E.2d 898, 899 n.2 (1987); Rutherford v. Zearfoss, 221 Va. 685, 687, 272 S.E.2d 225, 226 (1980).

She took the child's pulse and discovered he had a heart rate in the 150s. An intensive care team took Dejuan to the Neonatal Intensive Care Unit. Dejuan's condition quickly deteriorated. He was, again, pronounced dead about two hours later.

Dr. Fabio Gutierrez performed an autopsy and concluded that the cause of Dejuan's death was cardiopulmonary arrest secondary to birth asphyxia as a result of being choked by his umbilical cord during labor and delivery. Dejuan's mother, as administratrix of her son's estate, filed a wrongful death action in circuit court against Dr. Debra, her medical practice, and the hospital. Asserting that Dejuan's injury fell within the scope of the Virginia Birth-Related Neurological Injury Compensation Act, the defendants sought the statutory tort immunity afforded under the Act. Pursuant to Code § 8.01-273.1, the trial court referred the question to the commission.

Before the commission, the parties submitted conflicting medical evidence on the newborn's precise condition prior to his death. This evidence, the defendants argued, triggered a statutory presumption that the Act governed Dejuan's injury. The commission disagreed, finding the evidence insufficient to invoke the presumption.

Dr. Debra, her medical practice, and the hospital appeal the commission's ruling to us claiming (a) the commission failed to properly apply the Act's statutory presumption and thereby misallocated the burden of proof, and (b) had the presumption been applied properly, it would have established the Act's coverage. After reviewing the history and purposes of the Act, we will address each of the appellants' arguments in turn. In our judgment, neither has merit.

II.

One of only two such statutes in the nation, the Virginia Birth-Related Neurological Compensation Act provides claimants with a no-fault remedy for compensation for qualified

injuries.  See Code § 38.2-5009.[2]  The Act also affords potential tort defendants (at least those who contribute voluntary assessments to the fund under Code § 38.2-5015), with an absolute immunity to civil malpractice liability for these injuries.  See Code § 38.2-5002(B).  "The Act generally provides the sole remedy for infants who have incurred a birth-related neurological injury caused by a 'participating physician' or a 'participating hospital,' and bars infants who have sustained injuries of this nature from maintaining a common law tort action against such a 'participating physician' or 'participating hospital.'"  Berner v. Mills, 265 Va. 408, 411, 579 S.E.2d 159, 160 (2003).

This finely engineered *quid pro quo*, however, does not uniformly favor claimants or potential tort defendants.  In cases where malpractice litigation appears ill advised, a claimant may seek the application of the Act to his claim to obtain benefits from the statutory compensation fund.  See Code §§ 38.2-5009, 38.2-5015(A).  But in cases where litigation may be more promising, a claimant may seek to *defeat* the application of the Act to his claim.  Each of our cases discussing the Act involves instances where claimants sought the application of the Act to their claims and were willing to stipulate the resulting tort immunity afforded to potential malpractice defendants.[3]  The case before us now, however, involves one of the second type:  a situation where the tort defendants in a pending malpractice lawsuit seek the application of the Act to the claim over the objection of the claimant.

---

[2] See generally The Definition of Compensable Injury and the Funding Mechanism of the Virginia Birth-Related Neurological Injury Compensation Act, House Doc. No. 63 (1990); see also Study to Increase the Scope and Magnitude of the Virginia Birth-Related Neurological Injury Compensation Program, House Doc. No. 58 (1998).

[3] Wolfe v. Va. Birth-Related Neuro. Injury Comp. Pgm., 40 Va. App. 565, 580, 580 S.E.2d 467, 474 (2003); Kidder v. Va. Birth-Related Neuro. Injury Comp. Pgm., 37 Va. App. 764, 778, 560 S.E.2d 907, 913 (2002); Coffey v. Va. Birth-Related Neuro. Injury Comp. Pgm., 37 Va. App. 390, 401-02, 558 S.E.2d 563, 569 (2002); Va. Birth-Related Neuro. Injury Comp. Pgm. v. Young, 34 Va. App. 306, 318, 541 S.E.2d 298, 304 (2001).

For the Act to apply, the infant must have suffered a "birth-related neurological injury."

See Coffey v. Va. Birth-Related Neuro. Injury Comp. Pgm., 37 Va. App. 390, 399-400, 558

S.E.2d 563, 568 (2002). Under Code § 38.2-5001, four things must be true for an injury to fit

this definition:

(1)   The infant sustained "an injury to the brain or spinal cord" that was "caused by deprivation of oxygen or mechanical injury."

(2)   The injury occurred "in the course of labor, delivery or resuscitation necessitated by a deprivation of oxygen or mechanical injury that occurred in the course of labor or delivery, in a hospital."

(3)   The injury rendered the infant "permanently motorically disabled and (i) developmentally disabled or (ii) for infants sufficiently developed to be cognitively evaluated, cognitively disabled."

(4)   Such disability caused "the infant to be permanently in need of assistance in all activities of daily living."[4]

---

[4]  The full text of the statutory definition in Code § 38.2-5001 states:

> "Birth-related neurological injury" means injury to the brain or spinal cord of an infant caused by the deprivation of oxygen or mechanical injury occurring in the course of labor, delivery or resuscitation necessitated by a deprivation of oxygen or mechanical injury that occurred in the course of labor or delivery, in a hospital which renders the infant permanently motorically disabled and (i) developmentally disabled or (ii) for infants sufficiently developed to be cognitively evaluated, cognitively disabled. In order to constitute a "birth-related neurological injury" within the meaning of this chapter, such disability shall cause the infant to be permanently in need of assistance in all activities of daily living. This definition shall apply to live births only and shall not include disability or death caused by genetic or congenital abnormality, degenerative neurological disease, or maternal substance abuse. The definition provided here shall apply retroactively to any child born on and after January 1, 1988, who suffers from an injury to the brain or spinal cord caused by the deprivation of oxygen or mechanical injury occurring in the course of labor, delivery or resuscitation in the immediate postdelivery period in a hospital.

If the party seeking the Act's application proves that the injury falls within this definition, the Act applies. The result is the potential availability of compensation to the claimants under Code § 38.2-5009 and the certain availability of tort immunity for any potential tort defendants under Code § 38.2-5002(B).

Under the Act, a rebuttable presumption of a birth-related neurological injury exists when the proponent of the Act's coverage proves elements one and three of the § 38.2-5001 definition. See Code § 38.2-5008(A)(1)(a). When these two predicate facts are proved, the factfinder may presume that elements two and four of the statutory definition are also met.[5] Once the presumption applies, the burden of proof shifts to the party opposing the presumption to disprove elements two and four, and thereby establish "that the injuries alleged are not birth-related neurological injuries within the meaning of the chapter." Wolfe v. Va. Birth-Related Neuro.

---

[5] Code § 38.2-5008(A)(1)(a) provides:

The Commission shall determine, on the basis of the evidence presented to it, the following issues:

1.      Whether the injury claimed is a birth-related neurological injury as defined in § 38.2-5001.

   a.      A rebuttable presumption shall arise that the injury alleged is a birth-related neurological injury where it has been demonstrated, to the satisfaction of the Virginia Workers' Compensation Commission, that the infant has sustained a brain or spinal cord injury caused by oxygen deprivation or mechanical injury, and that the infant was thereby rendered permanently motorically disabled and (i) developmentally disabled or (ii) for infants sufficiently developed to be cognitively evaluated, cognitively disabled.

   If either party disagrees with such presumption, that party shall have the burden of proving that the injuries alleged are not birth-related neurological injuries within the meaning of the chapter.

Injury Comp. Pgm., 40 Va. App. 565, 578, 580 S.E.2d 467, 474 (2003) (quoting Code § 38.2-5008(A)(1)(a)).[6]

A.

In this case, the parties agree that Dejuan suffered "an injury to the brain or spinal cord" caused by the "deprivation of oxygen or mechanical injury" — element one of the statutory definition and the first predicate fact necessary for the presumption. They also agree that Dejuan's injury occurred "in the course of labor, delivery or resuscitation necessitated by a deprivation of oxygen or mechanical injury that occurred in the course of labor or delivery, in a hospital" — element two of the definition and a fact that may be inferred if the presumption applies. The parties dispute whether Dejuan's injury caused him to be "permanently in need of assistance in all activities of daily living," but admit that this fact may be inferred if the statutory presumption applies.

The dispositive issue thus centers on whether appellants established that Dejuan, prior to his death, was permanently "motorically disabled" and "developmentally" or "cognitively" disabled — the second predicate fact necessary for the § 38.2-5008(A)(1)(a) presumption to apply. To resolve this dispute, we must first address appellants' argument that a predicate fact can be established merely by "the submission of any credible evidence." Under this view, the presentation of any plausible evidence (regardless of whether it is in fact believed) triggers the presumption and shifts the burden of persuasion to the other side to rebut it. After all, appellants

---

[6] Because of the "difficulty in proving when such an injury was sustained" and the equally difficult task of proving, prospectively, that the infant will permanently need assistance in all activities of daily living, "the legislature enacted a presumption to assist potential claimants in obtaining benefits." Coffey, 37 Va. App. at 400, 558 S.E.2d at 568. Despite Coffey's contextualization of the issue, however, the presumption also applies in cases where the claimant is not seeking assistance in obtaining statutory benefits, but rather is seeking to defeat the application of the Act and its resulting tort immunity. In such circumstances, the medical providers who seek the Act's application to the claimant's injury bear the burden of proof.

correctly point out, we have described the burden as merely "a *prima facie*" showing, <u>Coffey</u>, 37 Va. App. at 401, 558 S.E.2d at 569, which literally means "at first sight" or "on first appearance," <u>Black's Law Dictionary</u> 1209 (7th ed. 1999). That description, as a general rule, does not connote anything more than a mere evidentiary sufficiency. <u>See</u>, <u>e.g.</u>, <u>Virginia v. Black</u>,

538 U.S. __, 123 S. Ct. 1536, 1554 (2003) (Scalia, J., concurring in part) ("'*Prima facie* evidence of a fact is such evidence as, in judgment of law, is sufficient to establish the fact; and, if not rebutted, remains sufficient for the purpose.'" (quoting 7B <u>Michie's Jurisprudence of Virginia and West Virginia</u> § 32 (1998)). "*Prima facie* evidence is evidence which on its first appearance is sufficient to raise a presumption of fact or establish the fact in question unless rebutted." <u>Commonwealth v. Dalton</u>, 11 Va. App. 620, 623, 400 S.E.2d 801, 803 (1991) (quoting <u>Babbitt v. Miller</u>, 192 Va. 372, 379-80, 64 S.E.2d 718, 722 (1951)).[7]

Even so, the expression "*prima facie* showing," <u>Coffey</u>, 37 Va. App. at 401, 558 S.E.2d at 569, need not necessarily be understood to describe a mere hypothetical sufficiency of the evidence. Though uncommon, this expression has been used alongside an actual preponderance standard for purposes of triggering a presumption. In Title VII cases, for example, the United States Supreme Court describes the role of a "*prima facie* case" in just this way:

> The burden of establishing a *prima facie* case of disparate treatment is not onerous. *The plaintiff must prove by a preponderance of the evidence* that she applied for an available position for which she was qualified, but was rejected [all

---

[7] When a trial judge in a civil jury case, for example, entertains a motion to strike alleging that the plaintiff has not made out a *prima facie* case, the judge does not ask whether he personally believes that the evidence rises to a preponderance — rather, he asks whether the conclusion the plaintiff draws from the evidence would so "defy logic and common sense" that no rational factfinder could adopt it. <u>Upper Occoquan Sewage Auth. v. Blake Constr.</u>, 266 Va. 582, 590 n.6, 587 S.E.2d 721, 725 n.6 (2003); <u>see generally</u> W. Hamilton Bryson, <u>Virginia Civil Procedure</u> 447 (3d ed. 1997).

predicate facts] under the circumstances which give rise to an
inference of unlawful discrimination [the presumed fact].

Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) (emphasis added); see also

McDonnell Douglas Corp v. Green, 411 U.S. 792, 802 (1973) (holding that claimant triggers the

presumption by carrying "the initial burden under the statute of establishing a *prima facie* case of

racial discrimination"); cf. Wolfe, 40 Va. App. at 580, 580 S.E.2d at 474 (accepting, without

discussion, that a "preponderance of the evidence" standard applies to the § 38.2-5008(A)(1)

presumption). This description of a *prima facie* case requires the factfinder to subjectively

believe the evidence preponderates in the claimant's favor, not merely to conclude that an

objective, rational factfinder could so find.

The subtle distinction between these two competing views of a *prima facie* case, while

seeming semantic, understates its potentially outcome-determinative impact. This is particularly

true in cases where, as here, the dispute involves not so much a contest between two

contradictory sets of facts, but rather a scramble over how to interpret the paucity of facts

favoring either side. In such cases, the party with the ultimate burden of proof must demonstrate

not only that his view of the evidence should be adopted with confidence, but also that any view

of such sketchy evidence could be confidently adopted.

We do not answer appellants' argument, however, by weighing the competing policy

considerations underlying the assignment of the shifting burdens of proof to determine which

would best fit this case. Our task is considerably more simple. "We begin, as always, with the

language of the statute." Duncan v. Walker, 533 U.S. 167, 172 (2001). And we strive to give

that language a "literal construction" unless doing so "would involve a manifest absurdity."

Chase v. DaimlerChrysler Corp., 266 Va. 544, 547, 587 S.E.2d 521, 522 (2003) (citations

omitted); see also Mouberry v. Commonwealth, 39 Va. App. 576, 583, 575 S.E.2d 567, 570

(2003) (recognizing that statutory words should be given "their common, ordinary and accepted

meaning"). This textualist approach presumes that the legislature "'chose, with care,' the specific words of the statute." Kane v. Szymczak, 41 Va. App. 365, 371, 585 S.E.2d 349, 352-53 (2003) (citations omitted).

In this case, the Virginia Birth-Related Neurological Injury Compensation Act states that the presumption arises when the predicate facts have been "demonstrated, to the *satisfaction* of the Virginia Workers' Compensation Commission." Code § 38.2-5008(A)(1)(a) (emphasis added). To demonstrate a fact to the satisfaction of the factfinder means to *persuade* the actual factfinder, not merely to demonstrate the plausibility of the proffered fact to a sufficient degree that any rational factfinder *could be persuaded*. Relying on this statutory text, we reject appellants' argument that "the submission of any credible evidence" triggers the presumption. Instead, we hold that the party asserting the presumption must demonstrate by a preponderance of the evidence that the predicate facts are true. Only then does the presumption arise and the burden of proof shift to the party opposing the presumption.

B.

We next address appellants' assertion that the commission erred in holding that they did not prove by a preponderance that Dejuan was permanently "motorically disabled" and "developmentally" or "cognitively" disabled, the second predicate fact necessary to give rise to the § 38.2-5008(A)(1)(a) presumption. For the following reasons, we conclude that the commission acted within the scope of its decisionmaking discretion as factfinder.

Appellants produced the expert opinions of Dr. Edward Karotkin and Dr. Warren Broocker. In a letter opinion, Dr. Karotkin concluded that "[e]ven if the child had responded to the resuscitative efforts, due to the profound oxygen deprivation to his brain, he would have been rendered permanently motorically disabled, developmentally disabled, and cognitively disabled." Testifying before the deputy commissioner, Dr. Broocker stated that "usually when the asphyxia

- 10 -

is severe enough to cause Apgar scores" as low as Dejuan's, "the long-term neurologic condition of the baby will be affected. To what degree it will be affected varies from individual to individual, but it will be affected." Dr. Broocker admitted some doubt, however, as to the accuracy of Apgar scores in predicting future neurological deficits. These scores have been used "pretty glibly over the years as medical fact," Dr. Broocker observed, and "there are some problems with the Apgar scores actually really predicting as far as how well the baby will do neurologically later on." He also noted that "everybody's got an anecdotal case of an extremely poor Apgar score and the baby did well subsequently . . . ."

Dejuan's estate filed the report of Dr. David Axelrod who stated that, given the paucity of medical evidence available to make such a judgment, he did not "believe that anyone" could make the determination whether Dejuan "would have been permanently motorically disabled and developmentally disabled had he survived." Based upon his review of the child's autopsy, "which showed no pathological damage to the brain such as bleeding, or signs of necrosis," there was "no evidence that this baby would have been permanently motorically disabled and developmentally disabled if he had survived."

The commission, pursuant to Code § 38.2-5008(C), solicited a report from a panel of three impartial physicians. In a letter dated November 29, 2001, Dr. William N.P. Herbert, Dr. James E. Ferguson, II, and Dr. Barbara Head stated: "Given the fact that this infant expired approximately 2 1/2 hours following delivery, we are unable to determine that the infant was developmentally or cognitively disabled, nor can we state that the infant would be permanently in need of assistance in all activities of daily living." As a result, they concluded, "the evidence in this case does not meet the criteria" for a birth-related neurological injury under the Act.

Faced with this evidence, the commission found that appellants failed to prove Dejuan was permanently motorically disabled and developmentally or cognitively disabled. The

commission rejected Dr. Karotkin's opinion because there was "no evidence to quantify the amount of oxygen deprivation suffered by the infant . . . , no damage to the brain, such as intracranial bleeding or any other pathology" in the autopsy report and "no blood from the cord was obtained for testing." Equally unconvincing to the commission was Dr. Broocker's opinion, which "offered no opinion as to whether the infant would have been developmentally disabled." Finding more persuasive the opinions of Dr. Axlerod and the three independent panel physicians, the commission held that appellants failed to prove that Dejuan was permanently "motorically disabled" and "developmentally" or "cognitively" disabled. Appellants, therefore, failed to trigger the presumption and thereby shift the ultimate burden of proof.

We are in no position to disagree. Of the six physicians that reviewed the file, four stated that they could not "determine that the infant was developmentally or cognitively disabled" at the time of his death. Three of these four physicians were independent experts appointed by the commission. Only one physician stated unequivocally that Dejuan was permanently motorically disabled and developmentally or cognitively disabled — and the commission found this opinion unpersuasive given the lack of any reliable diagnostic evidence.

"Questions raised by conflicting medical opinions must be decided by the commission." Wolfe, 40 Va. App. at 580, 580 S.E.2d at 474; Kidder v. Va. Birth-Related Neuro. Injury Comp. Pgm., 37 Va. App. 764, 778, 560 S.E.2d 907, 913 (2002); Va. Birth-Related Neuro. Injury Comp. Pgm. v. Young, 34 Va. App. 306, 318, 541 S.E.2d 298, 304 (2001). This appellate deference is not a mere legal custom, subject to a flexible application, but a statutory command making clear that the commission's decision "shall be conclusive and binding as to all questions of fact." Code § 38.2-5011(A). Medical evidence, therefore, remains "subject to the commission's consideration and weighing." Wolfe, 40 Va. App. at 580, 580 S.E.2d at 474 (quoting Young, 34 Va. App. at 318, 541 S.E.2d at 304) (citations and internal quotation marks

- 12 -

omitted). And the appearance of "contrary evidence in the record is of no consequence if there is credible evidence to support the commission's finding." Id.; see also Kidder, 37 Va. App. at 778, 560 S.E.2d at 913.

Despite this deference, appellants argue, the commission's findings cannot be sustained because Dejuan's death, by itself, overcomes any evidentiary weaknesses in their case. Under this theory, "the death of an infant from a birth-related oxygen deprivation injury automatically qualifies the infant under the Act." We find this view flawed for two reasons.

First, it is a *non sequitur* to assert that a disability — as that term is specifically defined and qualified in the statute — always precedes death or is subsumed by it. While an injury may be an anatomical antecedent to death, the same cannot be said of a statutory disability. It may or may not, depending on the facts. A *per se* rule equating death with disability mixes unrelated concepts because, as the commission correctly put it, "Death is the cessation of life, not a measure of disability."

Second, the Act is a comprehensive legislative enactment. It includes multiple provisions defining its terms, describing its scope, and qualifying its reach. Despite this elaborate statutory scheme, not a word expressly says (or, for that matter, reasonably implies) that death should automatically be equated with the highly specific definitional criteria used to determine the Act's coverage. The omission of any statutory language treating death as a *per se* event covered by the Act, even if problematic as a policy matter, cannot be remedied by the courts.[8] "The act of choosing carefully some words necessarily implies others are omitted with equal care." Kane, 41 Va. App. at 372, 585 S.E.2d at 353. "Any such change to the statute must be a legislative, rather than a judicial, undertaking." Mouberry, 39 Va. App. at 584-85, 575 S.E.2d at 571. To advocate a statutory

- 13 -

---

[8] The 2003 session of the General Assembly added a new section to the statute addressing infant deaths within 180 days of birth.  See Code § 38.2-5009.1 (2003 Va. Acts, ch. 897). Because the new provision applies prospectively only, we do not consider it.

interpretation that, if accepted, would essentially rewrite the legislative text "presupposes a power in the judiciary that simply does not exist." Id. We thus reject appellants' invitation to judicially graft into the statute an unwritten provision applying the Act to all newborns who die shortly after birth.[9]

III.

Because the commission applied correctly the legal principles governing the presumption and rested its factfinding on credible evidence, we affirm.

Affirmed.

---

[9] The Commission also recognized this limitation on its powers. Its opinion in this case concludes: "There is no presumption of disability in those cases where the infant dies shortly after birth. Even though there may be a valid argument for the creation of such a presumption, the Commission should not judicially change the clear language of the statute."