COURT OF APPEALS OF VIRGINIA


Present:    Judges Bumgardner, Clements and Retired Judge Strickland[*]
Argued at Salem, Virginia


WILLIAM T. YOUNG, JR., AN INFANT,
 BY HIS MOTHER AND NEXT FRIEND,
 ADA F. YOUNG, AND ADA F. YOUNG

                                                            OPINION BY
v.      Record No. 2505-04-3            JUDGE JEAN HARRISON CLEMENTS
                                                        OCTOBER 4, 2005

VIRGINIA BIRTH-RELATED NEUROLOGICAL
 INJURY COMPENSATION PROGRAM


                FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

            Michael R. McCarthy (Collier Shannon Scott, PLLC, on briefs), for
            appellants.

            Angela Boice Axselle, Assistant Attorney General (Judith Williams
            Jagdmann, Attorney General; Francis S. Ferguson, Deputy Attorney
            General, on brief), for appellee.


        William T. Young, Jr. (Tommy) and his mother, Ada F. Young, appeal a decision of the

Virginia Workers' Compensation Commission (commission) denying Ms. Young's request on

Tommy's behalf for certain housing benefits under the Virginia Birth-Related Neurological

Injury Compensation Act (Act), Code §§ 38.2-5000 to 38.2-5021. Specifically, Ms. Young

contends the commission erred in determining she was not entitled to housing benefits that were

in effect when she filed her claim for compensation for Tommy's birth-related neurological

injury and when that claim was first adjudicated by the commission. For the reasons that follow,

we affirm the commission's decision.

---

        [*] Retired Judge Diane McQ. Strickland participated in this case by designation pursuant
to Code § 17.1-400(C).

I.  BACKGROUND

The facts relevant to this appeal are not in dispute.  Ms. Young gave birth to Tommy on March 30, 1989.  On September 14, 1998, Ms. Young filed a claim with the commission, pursuant to Code § 38.2-5004, seeking admission into the Virginia Birth-Related Neurological Injury Compensation Program (Program) in order to obtain compensation for Tommy's birth-related neurological injury.

On January 8, 1999, the deputy commissioner denied the claim.  On March 10, 2000, the full commission reversed the deputy commissioner's decision and awarded Tommy "all the benefits provided by Code § 38.2-5009."  On February 13, 2001, this Court affirmed the full commission's decision.

In early 2003, Ms. Young, who lived with Tommy in rental property, requested cash-grant housing benefits from the Program.  Ms. Young had made no prior requests for housing benefits from the Program.  By letters dated April 14, 2003, and June 3, 2003, the Program informed Ms. Young that Tommy was not eligible for the requested housing benefits because, in response to an actuarial study of the Program, the Program's Board of Directors (Board) had "terminated all housing benefits for awards after January 1, 2000," and Tommy was not admitted into the Program until March 20, 2000, at the earliest.  The Program also informed Ms. Young that, although the Board had passed a new housing-benefits policy on September 19, 2000, providing "one-time funds for medically necessary modifications or construction of an accessible bedroom and bathroom," those benefits were available only to families that owned their own homes.  The Program further noted that, although it anticipated being able to eventually offer "appropriate housing benefits" to families that rented their homes, such benefits were still under development and not yet available.

Ms. Young appealed the Program's denial of her request for housing benefits to the commission. The deputy commissioner conducted an evidentiary hearing on October 9, 2003.

At that hearing, Ms. Young argued that Tommy was entitled to the housing benefits that were in effect when she first applied for Tommy's admission into the Program on September 14, 1998, or the housing benefits that were in effect when that claim was first adjudicated by the deputy commissioner on January 8, 1999. Ms. Young testified that she and Tommy had lived in the same rental house since April 1999, and she needed housing benefits in order to provide Tommy with a suitable home that would accommodate his needs. Unlike their current home, she explained, a suitable home would have hallways and doorways that were wide enough to accommodate the new power wheelchair the Program was providing, an accessible kitchen that would allow Tommy to roll himself up to the kitchen table, a screen porch that would permit Tommy to enjoy fresh air without exposure to insects, and a bathroom that was large enough to accommodate an accessible toilet, a lift, and a roll-in shower.

According to Ms. Young, it took two people to lift Tommy, who weighed 75 pounds and could not use his legs. She explained that, although the Program provided a "skilled nursing assistant" to help her with Tommy when he was not at school and a lift for Tommy's bedroom, Ms. Young still had to help lift Tommy in order for him to use the bathroom and would have to help carry him from the hallway to his bed if, as she suspected, his new, bigger power wheelchair would not fit through his bedroom door. Ms. Young stated that she had been "diagnosed with a disc disease" and was "not supposed to be lifting." Ms. Young further stated that she had applied to the Program for payment for a male friend to help her and the nursing assistant with Tommy. Ms. Young also testified that she had not obtained a report from a doctor or therapist stating that the requested accommodations were medically necessary, and had not sought

permission from the landlord to have any work done on her existing home because the Program told her it would not pay for renovating rental homes.

The Program argued at the hearing that Ms. Young was not entitled to the housing benefits she sought because those benefits were "no longer available at the time [Tommy] was admitted into the Program" and the Program's provision of housing benefits was a gratuity rather than mandated by the Act. The Program further informed the deputy commissioner that no housing benefits were currently available for families who did not own their own home, but added that the Board was revisiting its housing-benefits policy with respect to claimants who rented their homes. The Program introduced the Board's minutes pertaining to housing benefits and the "Guidelines for the Operation of the Virginia Birth-Related Neurological Injury Compensation Program" (Guidelines) adopted by the Board.

As indicated by the Board's minutes and the periodically revised "Housing" section of the Guidelines, the Program's housing-benefits policy changed several times prior to Ms. Young's request for housing benefits in 2003. On April 15, 1997, the Board adopted its first housing-benefits policy, under which the Program offered to fund the construction of a new, accessible home "determined to be medically appropriate for the needs of the child in the most cost effective manner" or the "feasible and reasonably priced" modification of an existing family-owned home to provide accessibility. The new home, which could not exceed 3,300 square feet, would be "titled in trust for the child, subject to use by the child's family" until the child's death or permanent institutionalization. A renovated home would remain titled in the name of the child's parents. "The maximum benefit for any one house, including renovation costs, [was] not to exceed $500,000."

That same date, the Board voted to purchase homes in trust for three families and approved the purchase of another trust home "in principle."

- 4 -

On November 17, 1998, the Board adopted a new housing-benefits policy effective January 1, 1999, under which, in lieu of building trust homes, the Program would provide families with a secured cash grant to acquire, build, or renovate their own homes. Under the new policy,

> [c]laims awarded in 1998 would be grandfathered in under the April 15, 1997 guidelines; however, 1998 awarded claims, which currently [did] not have homes under construction, would be offered a housing allowance in lieu of trust housing pending the drafting of Guideline language to support the change and a review of tax implicaitons, if any, for the recipients and the Program.

In furtherance of the implementation of its new policy, the Board voted on May 18, 1999, to allocate a maximum "base sum of $175,000 for [medically necessary] housing for the period of time the child participates in the Program plus an additive computed from Property Estimation Information" based on the location of the home being acquired, built, or renovated. The Board also reviewed a draft revision of the "Housing" section of the Guidelines and granted the request of five families for cash grants for the construction of new, accessible homes. In granting those requests, the Board advised the claimants that the cash grants would not be available until the documentation enabling the Program to award cash grants was finalized and "approved by the Board."

On September 24, 1999, the Board, wanting "to finalize the housing allowance for medically necessary housing for claimants adopted in principle in November 1998," approved and adopted a revised "Guidelines Housing Document" and other documents allowing the Program to provide secured cash grants "to claims awarded effective January 1, 1999[,] and for any claim awarded prior to January 1, 1999[,] approved for a trust home provided that construction has not yet begun." The Board ordered that the finalized documents be sent to those families whose requests for cash grants had already been approved.

On January 18, 2000, the Board voted to award cash grants to reimburse a family for the construction of a new home suitable for their injured daughter's needs and to reimburse another family for modifications made to their home to accommodate their injured son.

That same date, representatives from the Bureau of Insurance of the State Corporation Commission (SCC) presented the Board with its statutorily mandated biennial funding report. See Code § 38.2-5021(A). The SCC's report indicated that the Program was becoming actuarially unsound and that a substantial contributing factor to that unsoundness was the Program's housing benefits. The report showed that, at the then current level of funding, the Program would have a $2.4 million deficit as of June 30, 2000, and a $12.9 million deficit by the end of the fiscal year in 2001. The report's author recommended that the actuarial soundness of the Program be restored by increasing the assessment fees paid by both participating and non-participating physicians and by participating hospitals to the full assessment level permitted under Code § 38.2-5020.

Following discussions with the SCC representatives, the Board voted to temporarily suspend all cash-grant benefits for housing "on claims awarded or adjudicated on or after January 1, 2000," pending answers to the Board's further questions for the report's author regarding the efficacy of maintaining the Program's solvency by eliminating housing benefits and gradually raising the assessment fees solely on participating physicians and hospitals. After being informed that its proposed plan would work only if participating physicians and hospitals were assessed "at the maximum level," the Board voted on June 3, 2000, to permanently terminate the cash-grant housing benefits for claims awarded on or after January 1, 2000, and to increase the assessment fees paid by participating physicians and hospitals to the statutory maximum.

On June 3, 2000, the Board voted to provide one-time funds for modification or construction of an accessible bedroom and bathroom in family-owned homes. On September 19, 2000, the Board revised the "Housing" section of the Guidelines to reflect its new housing-benefits policy.[1]

Following the evidentiary hearing, the deputy commissioner ruled that Ms. Young was not entitled to the trust-home and cash-grant housing benefits she sought because they were no longer in effect when she was admitted into the Program. Ms. Young appealed that decision to the full commission.

On October 1, 2004, the full commission reached the same result as the deputy commissioner, but for different reasons. Assuming Ms. Young was otherwise qualified to receive the requested housing benefits from the Program, the commission ruled that "[t]he right of a participant who otherwise qualifies for the [housing] benefit vests upon a condition precedent, i.e. application for the housing benefit." Therefore, the commission concluded, "Ms. Young is not entitled to the housing benefit that was in effect on any date before the date she applied for the housing benefit."

This appeal followed.

## II. ANALYSIS

On appeal, Ms. Young, who seeks a new, accessible home for Tommy, contends she is entitled to either the trust-home housing benefits that were in effect when she filed her claim for compensation for Tommy's birth-related neurological injury or the cash-grant housing benefits that were in effect when that claim was adjudicated by the deputy commissioner. Her right to those benefits, she asserts, vested when Tommy was born with a birth-related neurological injury

---

[1] The Program notes in its appellate brief that, "[u]nder its most recent set of guidelines approved on April 13, 2004, the Board [also] offers . . . reimbursement for renters to move to handicap accessible rental units."

in a participating hospital. From that day forward, Ms. Young argues, she had a "present, fixed right of future enjoyment" to the housing benefits offered by the Program under Code § 38.2-5009 "if otherwise qualified to receive such benefits."[2] Accordingly, Ms. Young's argument continues, the Board could not retroactively abrogate or otherwise impair her vested right to the housing benefits that were in effect on September 14, 1998, the day she asserted her right to housing benefits by filing a claim for all the benefits to which she was entitled under Code § 38.2-5009, or on January 8, 1999, the day the deputy commissioner adjudicated her claim, albeit incorrectly. Moreover, Ms. Young argues, the Program's denial of her request for those housing benefits was arbitrary and capricious because the Program afforded the same benefits "to similarly situated claimants admitted into the Program at the time [she] applied for admission or should have been admitted into the Program" and the Board's decision to terminate the cash-grant housing benefits was unreasonable. Thus, Ms. Young concludes, the commission erred in ruling that her right to housing benefits under the Program vested only when she applied for those specific benefits and that she was consequently not entitled to the cash-grant or trust-home housing benefits previously in effect since the Board had terminated them before she made that application. We disagree with Ms. Young and affirm the commission's decision.

While an award of the commission is "conclusive and binding [on appeal] as to all questions of fact," Code § 38.2-5011(A), "'[c]onclusions of the [c]ommission upon questions of law, or mixed questions of law and fact, are not binding on [appeal],'" Sinclair v. Shelter Constr. Corp., 23 Va. App. 154, 156-57, 474 S.E.2d 856, 857-58 (1996) (third alteration in original) (quoting City of Waynesboro v. Harter, 1 Va. App. 265, 269, 337 S.E.2d 901, 903 (1985)). The issue whether Ms. Young is entitled to the requested housing benefits under Code § 38.2-5009 is

_____

[2] For purposes of this appeal, we, like the commission, assume, without deciding, that Ms. Young otherwise qualified under the Act for the housing benefits at issue.

a mixed question of law and fact. Accordingly, the commission's decision with respect to that issue "is properly subject to [*de novo*] review by this Court." Fairfax County Fire & Rescue Dep't v. Mottram, 263 Va. 365, 371-72, 559 S.E.2d 698, 701 (2002).

In arguing that she is entitled to the trust-home or cash-grant housing benefits because her right to those benefits vested at Tommy's birth, Ms. Young misconstrues the Act and the nature of the benefits she seeks.

Enacted in 1987, the Act "provides claimants with a no-fault remedy for compensation for qualified [birth-related neurological] injuries" and "affords potential tort defendants (at least those who contribute voluntary assessments to the [Program] under Code § 38.2-5015) with an absolute immunity to civil malpractice liability for these overall injuries." Cooper v. Adler, 44 Va. App. 268, 275, 604 S.E.2d 747, 750 (2004) (citing Code § 38.2-5002). Thus, "[b]y delivering an infant in a participating hospital and/or through a participating physician, the baby's family automatically waives the right to bring a medical malpractice lawsuit against the participating physician or hospital if the baby incurs a birth injury that meets the definition in the [Act]."[3] Id. at 276, 604 S.E.2d at 751. In return, the baby's family automatically acquires the right to obtain statutorily mandated compensation from the Program if the baby incurs such an injury. See id. at 278, 604 S.E.2d at 752 ("The General Assembly expressly intended that [the common law] rights and remedies of [the injured infant's family] would be excluded in return for an award of benefits on behalf of the infant."); see also Romine v. Fla. Birth-Related Neurological Injury Comp. Ass'n, 842 So.2d 148, 154 (Fla. Dist. Ct. App. 2003) (holding, in considering a no-fault compensation plan for birth-related neurological injuries similar to Virginia's plan, that the "date of the child's birth and the injuries sustained at that birth, if any,

---

[3] This waiver does not apply, however, "where there is clear and convincing evidence that such physician or hospital intentionally or willfully caused or intended to cause a birth-related neurological injury." Code § 38.2-5002(C).

establish the right of the infant to receive . . . benefits and the scope of those benefits" under the plan).

The compensation to be awarded qualified claimants is set forth in Code § 38.2-5009. That statute provides, in pertinent part, that a claimant who qualifies under the Act for an award of benefits on behalf of a child who has incurred a birth-related neurological injury shall be awarded "compensation for [certain] items relative to such injury," including "[a]ctual medically necessary and reasonable expenses of medical and hospital, rehabilitative, residential and custodial care and service, special equipment or facilities, and related travel."[4]  Code § 38.2-5009(A)(1).

Ms. Young argues that her vested right to the trust-home and cash-grant housing benefits emanates from the statute's requirement that compensation be awarded for the expenses of "residential and custodial care and service" and "special equipment or facilities."  The Program argues that, based on the specific language of the statute, the General Assembly did not require the Program to provide the trust-home and cash-grant housing benefits to participants.  Thus, the Program submits, its awarding of trust-home and cash-grant housing benefits in the latter half of the 1990s was "gratuitous in nature and involve[d] no contractual rights or vested interests."  We agree with the Program.

We are mindful, in considering the scope of the benefits contemplated by Code § 38.2-5009(A)(1), that "'[c]ourts are not permitted to rewrite statutes.  This is a legislative function.  The manifest intention of the legislature, clearly disclosed by its language, must be applied.  There can be no departure from the words used where the intention is clear.'"  Barr v. Town & Country Properties, 240 Va. 292, 295, 396 S.E.2d 672, 674 (1990) (quoting Anderson v.

---

[4] This list of "items" in Code § 38.2-5009(A)(1) for which a qualified claimant is entitled to receive compensation has remained unchanged since the statute's inception in 1987.

<u>Commonwealth</u>, 182 Va. 560, 566, 29 S.E.2d 838, 841 (1944)). Thus, "'[w]here the legislature has used words of a plain and definite import the courts cannot put upon them a construction which amounts to holding the legislature did not mean what it has actually expressed.'" <u>Id.</u> (quoting <u>Watkins v. Hall</u>, 161 Va. 924, 930, 172 S.E. 445, 447 (1934)). "We must . . . assume that the legislature chose, with care, the words it used when it enacted the . . . statute, and we are bound by those words as we interpret the statute." <u>Id.</u> Accordingly, if the statutory language at issue is plain and unambiguous, we

> "give that language a 'literal construction' unless doing so 'would involve a manifest absurdity.'" [<u>Cent. Va. Obstetrics & Gynecology Assocs., P.C. v. Whitfield</u>, 42 Va. App. 264, 276, 590 S.E.2d 631, 638 (2004)] (quoting <u>Chase v. DaimlerChrysler Corp.</u>, 266 Va. 544, 547, 587 S.E.2d 521, 522 (2003)). And, by literal, we mean the statutory words "should be given their 'common, ordinary and accepted'" understanding. <u>Mouberry v. Commonwealth</u>, 39 Va. App. 576, 583, 575 S.E.2d 567, 570 (2003) (quoting <u>Germek v. Germek</u>, 34 Va. App. 1, 8, 537 S.E.2d 596, 600 (2000)).

<u>Meador v. Va. Birth-Related Neurological Injury Comp. Program</u>, 44 Va. App. 149, 154, 604 S.E.2d 88, 91 (2004). Furthermore, in giving an undefined term its common and accepted meaning, we must consider "the context in which the term is used." <u>Murphy v. Norfolk Cmty. Servs. Bd.</u>, 260 Va. 334, 339-40, 533 S.E.2d 922, 925 (2000).

As relevant to the issue before us, the language used in Code § 38.2-5009(A)(1) is plain and unambiguous and, construed literally, clearly manifests the legislature's intent to require the provision of compensation to an injured child's family for the specific "medically necessary and reasonable expenses" listed in the statute. The statute makes no express reference to "housing" in its list of compensable expenses. Nor does the statute, in using the terms "residential and custodial care and service" and "special equipment or facilities," provoke the implicit inclusion therein of the housing expenses covered by the trust-home and cash-grant housing benefits at issue here, as Ms. Young suggests. Indeed, in light of the context in which it is used in the

statute, the plain and generally accepted meaning of the term "residential and custodial care and service" connotes the type of in-home custodial assistance that Ms. Young testified she received from the "skilled nursing assistant" provided by the Program—not the construction or purchase of a new handicapped-accessible home.  See Webster's Third New International Dictionary 338, 2075 (1993) (defining "care" as "responsibility for or attention to safety and well-being" and defining "service" as "conduct or performance that assists or benefits someone").  Similarly, the plain and generally accepted meaning of the term "special equipment or facilities" connotes wheelchairs, vans, lifting equipment, and renovated bathrooms in family-owned homes, rather than new homes themselves.  See id. at 768, 812 (defining "equipment" as "the implements (as machinery or tools) used in an operation or activity : apparatus" and defining "facility" as "something that promotes the ease of any action, operation, transaction, or course of conduct" or "that is built, constructed, installed, or established to perform some particular function").

> Because the General Assembly, in fashioning the statutory scheme [of the Act], created a new right to compensation, unknown at common law, it could, and did, impose upon the new right such limitations as it deemed just.  Such statutory limitations become an integral part of the new right, defining and controlling it . . . .

Roller v. Basic Construction Co., 238 Va. 321, 327, 384 S.E.2d 323, 325-26 (1989).

We conclude, therefore, that Code § 38.2-5009(A)(1) cannot be reasonably read as requiring the Program to provide trust-home and cash-grant housing benefits to qualified claimants.  Hence, in the context of the present claim, the Program's awarding of those benefits to qualified claimants when its funds were apparently plentiful—from 1997 through the end of 1999—was gratuitous.  That is to say, the benefits were over and above what was required by the statute and were, thus, offered "without obligation to do so" and "without consideration in circumstances that [did] not otherwise impose a duty" to do so.  Black's Law Dictionary 721 (8th ed. 2004).  Hence, they were not part of the quid-pro-quo requirement of the Act, and Ms. Young

acquired no vested right to them upon Tommy's birth. See Kennedy Coal Corp. v. Buckhorn Coal Corp., 140 Va. 37, 45, 124 S.E. 482, 484 (1924) (defining a vested right as "a right, so fixed that it is not dependent on any future act, contingency or decision to make it more secure"); Dodge v. Bd. of Education, 302 U.S. 74, 79 (1937) ("If, upon a construction of the statute, it is found that the payments are gratuities, involving no agreement of the parties, the grant of them creates no vested right.").

At most, the Program's granting of the trust-home and cash-grant housing benefits was in the nature of a unilateral contract. See Patrick S. Atiyah, An Introduction to the Law of Contract, 126 (3d ed. 1981) ("[M]any unilateral contracts are in reality gratuitous promises enforced for good reason with no element of bargain."). In a unilateral contract, one party makes an offer in the form of a promise to do an act "upon the fulfillment of certain conditions" by the other party. Nicely v. Bank of Virginia Trust Co., 221 Va. 1084, 1089, 277 S.E.2d 209, 212 (1981). The second party's "previously inchoate rights" to the performance of the promised act by the first party "vest and become legally enforceable" only when the second party accepts the offer by satisfying the condition precedent. Id. Until the second party's rights vest, the first party "is free to modify [the] provisions" of its offer or even withdraw the offer completely. Pitts v. City of Richmond, 235 Va. 16, 20, 366 S.E.2d 56, 58 (1988). If the first party's offer "is no longer in effect at the time" the condition precedent is satisfied, the second party has no claim to the performance of the promised act by the first party. Id.

Here, as evidenced by the record, the trust-home and cash-grant housing benefits offered by the Program were subject to several conditions precedent, including the requirement that the claimant actually request those benefits. Ms. Young did not request such benefits until early 2003, by which time the Board had terminated its offer of both the trust-home and cash-grant

- 13 -

housing benefits. Thus, Ms. Young has no vested right to the trust-home and cash-grant housing benefits. Accordingly, she is not entitled to those benefits. Id.

As to Ms. Young's contention that the Program's denial of her request for trust-home and cash-grant housing benefits was arbitrary and capricious because (1) the Program awarded such benefits "to similarly situated claimants" and (2) the Board's decision to terminate the cash-grant housing benefits was unreasonable, our review of the record convinces us that this contention is without merit because the two premises upon which it is based are fatally flawed.

First, Ms. Young's assertion that claimants "similarly situated" to her received trust-home and cash-grant housing benefits is factually unsupported by the record. Indeed, in every instance in the record where the Board awarded either trust-home or cash-grant housing benefits, it is clear that the claimant had requested the housing benefits awarded while those benefits were in effect. Conversely, Ms. Young requested such housing benefits only after the Board had terminated them. It is clear, therefore, that she and the claimants who received trust-home or cash-grant housing benefits were not "similarly situated."

Likewise, Ms. Young's claim that the Board acted unreasonably in terminating the cash-grant housing benefits is unsupported by the record.

It is well established that an administrative agency

> "shall apply expert discretion to matters coming within its cognizance, and judicial interference is permissible only for relief against the arbitrary or capricious action that constitutes a clear abuse of the delegated discretion. The reviewing judicial authority may not exercise anew the jurisdiction of the administrative agency and merely substitute its own independent judgment for that of the body entrusted by the Legislature with the administrative function."

Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 243-44, 369 S.E.2d 1, 8 (1988) (quoting Va. Alcoholic Beverage Control Comm'n v. York Street Inn, Inc., 220 Va. 310, 315, 257 S.E.2d 851, 855 (1979)).

As set forth in the Act, the General Assembly has charged the Board with the job of administering the Program's fund. See Code § 38.2-5016(F). Implicit in that charge is the Board's responsibility of maintaining the solvency of the Program's fund. See, e.g., id. (describing the Board's responsibilities with regard to investing the Program's monetary assets); Code § 38.2-5021(B) (requiring notification of the General Assembly's leadership if the Program's fund "cannot be maintained on an actuarially sound basis"). To that end, the Bureau of Insurance of the SCC is required to perform actuarial investigations of the fund "no less frequently than biennially." Code § 38.2-5021(A).

In early 2000, the Board received an actuarial report from the SCC showing that the Program's fund was becoming actuarially unsound and that a substantial contributing factor to that unsoundness was the Program's housing benefits. The report showed that, at the then current level of funding, the Program would have a $2.4 million deficit as of June 30, 2000, and a $12.9 million deficit by the end of the fiscal year in 2001. In response, the Board terminated the cash-grant housing benefits that had been in effect and increased the assessment fees paid by participating physicians and hospitals to the statutory maximum.

Given our previous determination that the cash-grant housing benefits terminated by the Board were not specifically required under Code § 38.2-5009(A)(1) and the evidence in the record demonstrating the need for action by the Board to maintain the actuarial soundness of the Program's fund, we cannot say that the Board's decision to terminate the cash-grant housing benefits then in effect constituted an abuse of the Board's delegated discretion.

Accordingly, we reject Ms. Young's contention that the Program's denial of her request for trust-home and cash-grant housing benefits was arbitrary and capricious.

## III.  CONCLUSION

For these reasons, we agree with the commission that Ms. Young is not entitled to the trust-home housing benefits that were in effect when she filed her claim for compensation for Tommy's birth-related neurological injury or the cash-grant housing benefits that were in effect when that claim was first adjudicated by the commission.  Accordingly, we affirm the commission's decision denying Ms. Young's request for those housing benefits.

<u>Affirmed.</u>