COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, Beales and Retired Judge Overton[*]


INOVA FAIRFAX HOSPITAL AND
  INOVA HEALTH CARE SERVICES


v.        Record No. 0586-07-4


JAMIE YOST, ADMINISTRATOR OF THE
  ESTATE OF ORION YOST AND
  VIRGINIA BIRTH-RELATED NEUROLOGICAL        MEMORANDUM OPINION[**]
  INJURY COMPENSATION PROGRAM                      PER CURIAM
                                                 AUGUST 7, 2007
CARL T. BROWN, M.D.


v.        Record No. 0677-07-4


JAMIE YOST, ADMINISTRATOR OF THE
  ESTATE OF ORION YOST AND
  VIRGINIA BIRTH-RELATED NEUROLOGICAL
  INJURY COMPENSATION PROGRAM


             FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

             (William L. Carey; Michael L. Chang; Blankenship & Keith, P.C.,
             on brief), for appellants Inova Fairfax Hospital and Inova Health
             Care Services.

             (Mark M. Jones; Wilson, Elser, Moskowitz, Edelman & Dicker,
             LLP, on brief), for appellant Carl T. Brown, M.D.

             (Robert F. McDonnell, Attorney General; Francis S. Ferguson,
             Deputy Attorney General; Carla R. Collins, Assistant Attorney
             General, on briefs), for appellee Virginia Birth-Related
             Neurological Injury Compensation Program.

             No brief for appellee Jamie Yost, Administrator of the Estate of
             Orion Yost.

---

[*] Retired Judge Overton took part in the consideration of this case by designation pursuant to Code § 17.1-400.


[**] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

In these two related appeals, which we consolidate for decision, Inova Fairfax Hospital, Inova Health Care Services, and Carl T. Brown, M.D. (collectively referred to hereinafter as "appellants") appeal a decision of the Workers' Compensation Commission finding that the deceased infant, Orion Yost ("the infant"), does not qualify for inclusion under the Virginia Birth-Related Neurological Injury Compensation Act ("the Act") on the ground that the evidence failed to prove that the infant would have been permanently and motorically disabled.[1] Upon reviewing the record and the briefs of the parties, we conclude that these appeals are without merit. Accordingly, we summarily affirm the commission's decision. See Rule 5A:27.

"On appeal, we view the evidence in the light most favorable to the prevailing party before the commission." Central Va. Obstetrics & Gynecology Assocs., P.C. v. Whitfield, 42 Va. App. 264, 269, 590 S.E.2d 631, 634 (2004).

On September 11, 2002, the mother, then approximately thirty-four weeks pregnant with the infant, was involved in a motor vehicle accident. She arrived at the Inova Fairfax Hospital emergency room shortly before 9:00 p.m. that night, complaining of chest pain in the area of where her seat belt would have been. The fetal heart rate was within the normal range at that point, and the mother felt the baby kick. However, upon further evaluation in the labor and delivery unit, the nurse could not locate fetal heart tones. Dr. Carl T. Brown, the mother's obstetrician, immediately performed an ultrasound and determined the fetal heart was beating at only 70 to 80 beats per minute. Consequently, Dr. Brown immediately performed a cesarean section. At birth, at 11:47 p.m., the infant's APGAR scores were 0 at one minute, 0 at five minutes, and 0 at ten minutes, indicating no breathing, no heart rate, no response to stimulation,

---

[1] The commission also found the infant suffered a birth-related neurological injury to the brain as a result of oxygen-deprivation during labor and delivery. None of the parties sought further review of that finding before the full commission, nor has it been appealed to this Court. Accordingly, it is binding and conclusive upon us.

no muscle tone or floppy tone, and bluish gray or pale skin tone.  The infant was intubated and ventilated.  An umbilical venous catheter was placed, and chest compressions were administered.  At around eighteen minutes after birth, a heartbeat was achieved, the first spontaneous respirations were noted, and the infant was taken to the neonatal intensive care unit.

After delivery, an initial arterial blood gas pH of 6.54 was recorded in neonatologist Dr. Robin Baker's Admission, History and Physical report.  A lab slip indicated the first pH was 6.68.  Both values were extremely low, indicating acidosis and oxygen deprivation.  In the first day of life, the infant experienced brain seizures and a brain EEG was found to be abnormal.  The EEG report stated "[t]his is a severely abnormal electroencephalogram because of the low voltage activity.  No normal activity is seen."

The infant showed clinical evidence of asphyxia involving multiple systems, including the renal system, respiratory system, and neurological system.  By September 13, 2002, with the counseling of the infant's physicians regarding his prognosis, the infant's parents chose to remove life support.  The infant was pronounced dead at 6:25 p.m. on September 13, 2002, according to a Death Summary signed by neonatologist, Dr. Fern Litman.

On September 27, 2005, a panel from the Department of Obstetrics and Gynecology of the University of Virginia Health System, consisting of Drs. William N.P. Herbert, Devereux N. Saller, Jr., and Christian A. Chisholm, issued a report concluding that the infant "would qualify for compensation under . . . the Act."  The panel opined that the infant's condition at birth "strongly suggests causation by oxygen deprivation" as evidenced by the extremely low initial arterial pH and the early multi-system failure including seizures, as well as the lack of evidence of trauma, congenital malformation, metabolic diseases, infection, or coagulopathy."  The panel concluded as follows:

> The clinical course provides evidence that the hypoxia most
> likely occurred between the apparent time of the accident and the

evaluation in the obstetric triage area. Marked fetal bradycardia, Apgar scores of 0, and the multi-system neonatal dysfunction support the concept that the causative event occurred in the immediate prenatal period.

Because this infant expired shortly after delivery, long term effects of these perinatal circumstances cannot be determined.

In a letter dated October 6, 2005, in response to the commission's request for clarification of the panel's report, Dr. Herbert wrote that due to the fact the infant died soon after birth, "the long-term neurological sequelae could not be assessed." Dr. Herbert noted that the panel "questioned why a case such as this would ever have been sent for review given the fact that significant long-term neurological impairment is a fundamental part of this statute." However, he then went on to state that the infant's "hypoxia would likely have rendered the child totally disabled during the period of time the child actually lived up until his death." Dr. Herbert noted "[w]e obviously did not find any damages beyond the short period of time [the infant] lived after birth, though, in our opinion, he would likely have been totally disabled had he lived." Yet, in the very next sentence, Dr. Herbert concludes as follows: "In summary, our report concludes that we cannot determine 'significant long-term' effects of the perinatal hypoxia, given that the child lived a short period of time."

On October 10, 2005, Dr. Susan Lucas, a retired board certified obstetrician and gynecologist, who reviewed the statute and medical records of the mother and infant on behalf of Inova Fairfax Hospital and Inova Health Care Services, issued a letter report, in which she concluded to a reasonable degree of medical certainty that the infant satisfied the criteria for inclusion under the Act. Dr. Lucas opined that the fetus suffered "a severe fetal-maternal hemorrhage," which was undetected and "caused the fetus to be severely oxygen-deprived

during the course of labor and delivery."[2] Dr. Lucas concluded that as a result, the infant "suffered a non-reversible injury to his brain," "readily apparent in his condition at birth . . . ." She further opined that the infant's brain injury due to oxygen-deprivation "rendered [him] permanently motorically disabled as well as developmentally disabled." She opined that the infant would have been wholly dependent on the ventilator to make him breathe and that he would never have achieved any developmental benchmarks. She concluded that "[s]uch severe injuries cause permanent damage, and would require [the infant] to be dependent on others for all aspects of his care, throughout his entire life."

During Dr. Lucas's deposition, she stated that the infant, who was "totally dependent on the ventilator," required "massive amount of drugs, like Dopamine, just in order to maintain blood pressure and keep his heart rate going." She further stated that despite all these drugs, "he never produced any urine, which is crucial to life. If you go into renal failure, you are going to die from renal failure." Dr. Lucas opined that even if "[the infant] had survived the early resuscitation in the hospital, he would have been severely developmentally and motor-wise disabled." She admitted her opinion was based solely on the infant's pH and brief clinical course as shown in the medical records. While she contended the infant would not have been able to do anything including following a toy with his eyes, sucking, rolling over, holding his head up, sitting up, and breathing, and that he would have required a feeding tube, she admitted nothing in the medical records substantiated that claim.

Dr. James T. Christmas, a board certified obstetrician and gynecologist at Commonwealth Perinatal Associates, P.C., reviewed the medical records of the mother and the

_____

[2] In her October 13, 2005 deposition, Dr. Lucas referred to the results of a Kleinhauer-Betke test performed at 9:05 p.m. on September 11, 2002, which showed 194 fetal red blood cells for every 5000 maternal cells. This showed that the infant spilled 97 ccs of packed red cells into the mother's circulation, which was an "absolutely abnormal" result.

infant and the statutory requirements on behalf of Jamie Yost and the infant. In Dr. Christmas's

October 12, 2005 report, he noted that "[s]hortly after delivery a maternal blood specimen was

sent for a Kleihauer-Betke stain," which "demonstrated an estimated feto-maternal hemorrhage

of 43 cc packed red blood cells," which "would be consistent with a feto-maternal bleed of

approximately 100 to 110 cc which would represent approximately one third of the blood volume

of a 33 week fetus." Dr. Christmas opined that the "most likely explanation for this unfortunate

outcome is feto-maternal hemorrhage caused by blunt abdominal trauma sustained at the time of

[the] motor vehicle accident." He noted as follows:

> [N]o evidence that the patient was in labor, nor is there any
> evidence that oxygen deprivation or mechanical trauma occurred
> during the course of delivery. Feto-maternal bleeding began at the
> time of the motor vehicle accident and in all likelihood continued
> until the time of delivery. In my opinion this led to fetal anemia
> and severe fetal hypotension. The delivery process itself would
> not have caused or exacerbated any compromise . . . . Any damage
> to the fetus would have occurred prior to delivery. Therefore,
> neither the mechanism of injury nor the timing would qualify this
> infant for inclusion [under the Act].

Dr. Christmas further opined that

> [s]ince there are some children with severe perinatal depression
> and hypoxic encephalopathy that ultimately develop normally, I do
> not think it is possible to predict the degree of disability (if any)
> that this child would have sustained had it survived. There is no
> Apgar score or pH level that guarantees that a child will have
> cerebral palsy or any other specific level of neurologic or other
> disability.

In Whitfield, we stated:

> For the Act to apply, the infant must have suffered a
> "birth-related neurological injury." Under Code § 38.2-5001, four
> things must be true for an injury to fit this definition:
>
>> (1) The infant sustained "an injury to the brain or spinal
>> cord" that was "caused by deprivation of oxygen or
>> mechanical injury."
>>
>> (2) The injury occurred "in the course of labor, delivery or
>> resuscitation necessitated by a deprivation of oxygen or

mechanical injury that occurred in the course of labor or delivery, in a hospital."

(3) The injury rendered the infant "permanently motorically disabled and (i) developmentally disabled or (ii) for infants sufficiently developed to be cognitively evaluated, cognitively disabled."

(4) Such disability caused "the infant to be permanently in need of assistance in all activities of daily living."

If the party seeking the Act's application proves that the injury falls within this definition, the Act applies. The result is the potential availability of compensation to the claimants under Code § 38.2-5009 and the certain availability of tort immunity for any potential tort defendants under Code § 38.2-5002(B).

Under the Act, a rebuttable presumption of a birth-related neurological injury exists when the proponent of the Act's coverage proves elements one and three of the § 38.2-5001 definition. When these two predicate facts are proved, the factfinder may presume that elements two and four of the statutory definition are also met. Once the presumption applies, the burden of proof shifts to the party opposing the presumption to disprove elements two and four, and thereby establish "that the injuries alleged are not birth-related neurological injuries within the meaning of the chapter."

Whitfield, 42 Va. App. at 272-73, 590 S.E.2d at 635-36 (citations omitted) (footnotes omitted).

This case "centers on whether appellants established that [the infant], prior to his death, was permanently 'motorically disabled' and 'developmentally' or 'cognitively' disabled — the second predicate fact necessary for the § 38.2-5008(A)(1)(a) presumption to apply." Id. at 274, 590 S.E.2d at 637.

In finding appellants failed to sustain their burden of proof on this element, the commission, relying upon Whitfield, found as follows:

We have in this case conflicting opinions from Dr. Lucas and Dr. Christmas. Dr. Lucas opines that the infant would have been permanently motorically and developmentally disabled had he lived, whereas Dr. Christmas opined that it is not possible to determine disability. The panel clarification authored by Dr. Herbert stated that because the infant lived such a short time "the long-term neurological sequelae could not be assessed."

- 7 -

However, Dr. Herbert also wrote that the infant's hypoxia "would likely have rendered the child totally disabled during the period of time the child actually lived up until his death."

In Whitfield, there were also conflicting opinions and a panel report in which it was concluded that the extent of disability could not be determined due to the infant's death two and one-half hours after delivery. We find the circumstances of this case are similar. We cannot presume disability, even in light of the dire conditions of this infant during his short life. Not only do Dr. Lucas and Dr. Christmas disagree, but the panel in issuing its clarification on the one hand said that the long term sequelae could not be assessed, and on the other hand said that the infant would have been total [sic] disabled up until his death. We find the opinion of Dr. Lucas well-reasoned, and just as we cannot presume disability, we also believe that we cannot rule out disability based solely on the fact that the infant lives so briefly. We also find well-reasoned the arguments on Review submitted on behalf of Dr. Brown. In particular, we agree it is unlikely the breathing tube would have been removed if there was indication the infant would have been able to develop without permanent disability.

In the end we must look to the evidence in this particular case, and the petitioner's burden of proof. Given the conflicting medical evidence, we conclude the petitioners failed to prove the statutorily required disability.

As we stated in Whitfield, "the party asserting the presumption must demonstrate by a preponderance of the evidence that the predicate facts are true. Only then does the presumption arise and the burden of proof shift to the party opposing the presumption." Id. at 277, 590 S.E.2d at 638. Moreover,

"[q]uestions raised by conflicting medical opinions must be decided by the commission." This appellate deference is not a mere legal custom, subject to a flexible application, but a statutory command making clear that the commission's decision "shall be conclusive and binding as to all questions of fact." Medical evidence, therefore, remains "subject to the commission's consideration and weighing." And the appearance of "contrary evidence in the record is of no consequence if there is credible evidence to support the commission's finding."

Id. at 279, 590 S.E.2d at 639 (citations omitted).

Here, while the commission recognized Dr. Lucas's well-reasoned opinion and the well-reasoned argument submitted on behalf of Dr. Brown, it ultimately found, based upon the extent of the conflicting medical evidence in this record, that appellants failed to demonstrate by a preponderance of the evidence the statutorily required disability. Because the commission's decision hinged on its resolution of the conflicting medical evidence, and there is credible evidence in the record to support it, it is binding and conclusive upon us.

In this case, as in Whitfield, "only one physician[, Dr. Lucas,] stated unequivocally that [the infant] was permanently motorically disabled and developmentally . . . disabled." Id. Dr. Christmas concluded that he was unable to render such an opinion, and the three panel obstetricians gave conflicting conclusions, on the one hand stating they could not render such an opinion, and then, on the other hand stating that the infant's hypoxia "would likely have rendered [him] totally disabled during the period of time [he] actually lived up until his death." In light of these conflicting opinions, the commission, as fact finder, was entitled to conclude that appellants failed to sustain their burden of proof by a preponderance, and we will not disturb that decision on appeal.

Accordingly, we summarily affirm the commission's decision.

Affirmed.