Richmond

## MATTHEW V. RUTHERFORD, BY HIS MOTHER AND NEXT FRIEND, GRETA RUTHERFORD

### V.

## JOHN ZEARFOSS

November 26, 1980.

Record No. 781364.

Present: All the Justices.

*Jack S. Rhoades (J. Ronald Lynch; Howard, Stevens, Lynch, Cake & Howard, P.C.,* on briefs), for appellant.
*R. Harrison Pledger, Jr.,* for appellee.

THOMPSON, J., delivered the opinion of the Court.

This appeal involves a medical malpractice claim in which the jury returned a verdict for the plaintiff in the amount of $1.5 million. The trial court set aside the verdict as excessive and granted a new trial on all issues. At the second trial final judgment was entered for the defendant. This appeal is limited to the consideration of two issues: (1) Was the jury verdict in the amount of $1.5 million excessive? and (2) if it was, should the trial court have granted a new trial on liability and damages, or just on damages alone?

Matthew V. Rutherford, by his mother and next friend, Greta Rutherford, brought an action against Dr. John Zearfoss, an Alexandria physician specializing in obstetrics and gynecology. Matthew alleged, *inter alia,* that on May 17, 1973, Dr. Zearfoss negligently delivered him and therefore caused him to be afflicted with cerebral palsy, which resulted in his permanently crippled condition.

On May 17, 1973, around 2:00 a.m., Mrs. Rutherford, who was approximately nine months pregnant, was admitted to Alexandria Hospital with mild labor contractions after a spontaneous rupture of her membranes several hours earlier and secretion of amniotic fluid.

Dr. Zearfoss, Mrs. Rutherford's obstetrician, examined Mrs. Rutherford at 6:15 a.m. His examination revealed that the baby's head had not descended into the pelvic canal and that Mrs. Rutherford

was having contractions every five minutes. Dr. Zearfoss administered an oxytocic drug called Tocosamine which is used to stimulate the uterus to contract more powerfully, thus forcing the baby's head down through the pelvic canal.

When Dr. Zearfoss examined Mrs. Rutherford again at 7:00 a.m., she was having mild to moderate contractions every three minutes, but the baby's head had still not descended through the pelvic opening. Dr. Zearfoss ordered another injection of Tocosamine. At 7:45 a.m. moderately hard contractions were occurring two to three minutes apart. The fetal heart rate was 160 beats per minute.* An attending nurse made a recorded observation of the presence of meconium, which is a bowel movement passed by the fetus through the vagina and indicates a possible oxygen deprivation in the baby's brain in a baby presenting head-first, as was Matthew.

At 9:45 a.m. Mrs. Rutherford's condition had not changed. At 10:15 a.m. Dr. Zearfoss ordered another injection of Tocosamine. At 10:20 a.m. Mrs. Rutherford was taken to the delivery room with a completely dilated cervix. At 10:45 a.m. Dr. Zearfoss administered intravenously another oxytocic medication, Syntocinon.

At sometime before 11:25 a.m. Dr. Zearfoss attached an instrument known as a vacuum extractor to Matthew's head and brought him down into his mother's vagina. Dr. Zearfoss then removed the vacuum extractor, applied forceps to the head, and delivered Matthew.

Following delivery Matthew was in a very depressed state. On an "APGAR" scoring system that awards points to various vital signs of a baby at one minute after birth, with ten as the highest rating and zero, or death, the lowest, Matthew registered a score of one. He had marked molding of the head and, while still in the hospital, had a number of seizures.

In the summer of 1974, Matthew was diagnosed as having spastic quadriparesis and ataxic cerebral palsy. Due to deficiency in muscle tone, he had paralysis in all four of his limbs and had abnormal reflex patterns. Testimony at trial revealed that when he was three years seven months old, Matthew's motor skills were at a level of less than twelve months, but he was above average in intellect, his adaptive behavior approaching that of a five year old. In an essentially undisputed prognosis, Matthew's cerebral palsy was described to be moderate to severe. Testimony also revealed that he may learn to walk, but it is improbable that he will ever run, climb a tree, throw

---

* Dr. John V. Kelly, an expert witness who testified at the trial, indicated that a normal fetal heartbeat ranges somewhere between 120 and 160 beats per minute.

a ball, swim, or play a musical instrument; that he cannot now feed himself; and that he may eventually be able to drive a car that is equipped with special mechanisms. All these deficiencies were attributed to Matthew's cerebral palsy which he will always have.

Evidence submitted at trial revealed that Dr. Zearfoss had, ten years previously, delivered Mrs. Rutherford's third child. Because that child was large, weighing approximately nine pounds three ounces at birth, the shoulders were stuck during delivery, and the extraction of the infant was difficult. As a consequence of delivery, that child suffered paralysis of one of its arms. Approximately a week before Matthew's delivery, Dr. Zearfoss noted on Mrs. Rutherford's chart that Matthew's estimated weight was nine to ten pounds. Therefore, Dr. Zearfoss knew that Matthew would be almost as large as or larger than Mrs. Rutherford's third child.

Each litigant presented expert witness testimony. Dr. John V. Kelly, Jr., who testified in behalf of Matthew Rutherford, stated that Dr. Zearfoss, at various stages in Matthew's delivery, violated the standard of medical care as it existed in Alexandria in May 1973 by not performing a "Caesarean section" delivery whereby the child is extracted through an incision in the abdominal and uterine walls of the mother when complications preclude a usual vaginal delivery. Dr. Kelly contended that had Matthew been delivered by Caesarean section, he would not have suffered oxygen deprivation, the consequence of which was cerebral palsy. It was also Dr. Kelly's opinion that administering oxytocic drugs before the engagement of the baby's head and giving an intravenous injection of Syntocinon only one-half hour after administering a dosage of Tocosamine constituted violations of the standard of care required of obstetricians practicing in Alexandria in May 1973, and contributed to Matthew's oxygen deprivation.

Conversely, Drs. Frederick P. Titus, Henry H. Ferrell, Jr., H. Glen Thompson, Harrison Picot, and Zearfoss all testified that there was no medical reason for performing a Caesarean section, and that throughout Matthew's delivery there had been no deviation from the accepted standard of care.

There was evidence introduced during the trial which indicated that Mrs. Rutherford had on at least one occasion expressed a desire not to have a Caesarean section performed. There was also a dispute as to whether Dr. Zearfoss had ever discussed the potential necessity of a Caesarean section with Mrs. Rutherford.

## I. *Was the Verdict Excessive?*

In his written opinion, the trial judge accurately summarized the evidence on the issue of damages, as follows:

> In arriving at its decision the Court has weighed the following factors, to-wit: the plaintiff's age; the life expectancy of the plaintiff; the nature, extent and duration of the injury sustained by the plaintiff; the effect of the injury on the normal activities of the plaintiff; and the nature and extent of his suffering, humiliation and embarrassment. It is significant to note that there was no evidence adduced from which damages for medical expenses, cost of special treatment, or loss of earning capacity could be ascertained, and that the damage instruction given at the request of the plaintiff did not include these elements of damage.

The opinion recited the following principles set forth in *Smithey* v. *Refining Co.*, 203 Va. 142, 146, 122 S.E.2d 872, 876 (1961):

> "But if it appears that the verdict is so excessive as to shock the conscience of the court and to create the impression that the jury has been influenced by passion, corruption or prejudice, or has misconceived or misunderstood the facts or the law, or if the award is so out of proportion to the injuries suffered to suggest that it is not the product of a fair and impartial decision, then it becomes the plain duty of the judge, acting within his legal authority, to correct the injustice."

Applying these principles, the trial court concluded that the verdict was so excessive that it shocked the conscience of the court; that there was no suggestion of corruption or prejudice on the part of the jury, but the other grounds for setting aside the verdict were present; and that the court was satisfied that the jury was influenced by sympathy for the plaintiff. Accordingly, the court set aside the verdict and ordered a new trial on all issues.

In the decision of this case we cannot say as a matter of law the trial judge abused his discretion, and we therefore cannot reverse his action.

## II. *New Trial.*

When the trial judge reached the conclusion that the verdict was excessive and that a new trial would be ordered, it was in his

discretion to decide whether a new trial should be on damages alone or on all issues *ab initio*. He chose the latter.

The trial judge justified his choice in this language:

> The issue of liability in the instant case was hotly contested; and, although the evidence was sufficient to support a verdict in favor of either party, there was no clear preponderance of the evidence in favor of either. Furthermore, it is not clear to the Court that the misconception of the jury from which the excessive verdict resulted did not also taint the finding of the jury on the issue of liability. This being the case, it is the opinion of the Court that the interest of justice would best be served by granting the defendant a new trial on all issues.

In *Rawle* v. *McIlhenny*, 163 Va. 735, 750-51, 177 S.E. 214, 221 (1934), we said in part:

> [I]n the exercise of this discretion it is always to be borne in mind that, before a new trial should be limited to the amount of damages, it should be reasonably clear that the . . . misconception of the jury . . . has not extended to its determination of the question of liability as well as to its determination of the amount of damages.

To the same effect is *Rome* v. *Kelly Springfield*, 217 Va. 943, 948, 234 S.E.2d 277, 281 (1977).

Here the trial court found that sympathy affected the verdict. We think that this impeaches the verdict as to both liability and damages and that a new trial on both issues should be ordered. *See Ford Motor Co.* v. *Mahone*, 205 F.2d 267 (4th Cir. 1953).

The trial judge did not abuse his discretion in ordering a new trial on all issues, and we affirm his action.

*Affirmed.*