## Richmond

FORD MOTOR COMPANY

V.

CONSTANCE K. BARTHOLOMEW

December 3, 1982.

Record No. 801026.

Present: All the Justices.

*Richard H. Lewis (Steven W. Bancroft,* on briefs), for appellant.

*Bernard S. Cohen (Robert C. Dunn; Cohen & Annand, P.C.,* on brief), for appellee.

POFF, J., delivered the opinion of the Court.

This is a manufacturer's appeal from a judgment entered in favor of a consumer in a products liability case.

Constance Bartholomew filed a motion for judgment seeking compensatory and punitive damages for injuries sustained in an automobile accident. Plaintiff alleged that Ford Motor Company and Dave Pyles Lincoln Mercury, one of its retail dealers, were liable to her on theories of negligence, strict liability, failure to warn of a design defect, and breach of implied warranty. The trial court granted Dave Pyles' motion to strike plaintiff's evidence against it but refused Ford's motion. At the conclusion of all the evidence, the trial court struck plaintiff's claim for punitive damages. The jury returned a verdict for plaintiff and fixed her damages at $50,000. Ford filed a motion to set aside the verdict and to enter judgment in its favor or, in the alternative, to award a new trial on liability and compensatory damages. The trial court overruled Ford's motion but ordered a remittitur of $33,500. Plaintiff elected to accept the remittitur under protest, and the trial court entered judgment in her favor for $16,500.

The accident occurred on October 22, 1976, in a parking lot near a grocery store where plaintiff had gone to shop. After she had bought her groceries, plaintiff, accompanied by her two-month-old son, drove her four-door Lincoln sedan to the front of the store, stopped in the parcel pick-up lane, and waited for help in loading her purchases. When help did not arrive, she decided to load the groceries herself. The pick-up lane was on a slight grade, so plaintiff "put the car in Park, . . . put the brake on, and . . . got out of the car, leaving the door open". The weather was "chilly", and to keep the infant warm, she left the motor and heater running. After placing several grocery bags in the back seat, she noticed that the car was moving backwards. She began running with the car, trying to get back into the front seat, but the door knocked her down and the left front wheel ran over her left leg. The car continued moving across the parking lot until it collided

with several other cars. Panic-stricken, plaintiff "dragged" herself to her car to check on her child.

The infant was not injured, but plaintiff suffered soft tissue damage to her leg, with swelling and bleeding under the skin. She incurred $292.10 in medical expenses for treatment as an outpatient. A month after the accident, the bruise had almost disappeared, but swelling, pain, and some limitation of flexion of the knee persisted over a period of nearly two years. Plaintiff's friends testified that she had undergone noticeable personality changes as the result of her experience. Plaintiff introduced no evidence of loss of earnings or earning capacity.

Plaintiff purchased the 1973 Lincoln, formerly owned by her father, from the dealer who had taken it in trade. She drove the car for nearly two years and had experienced no difficulty with the transmission until March 1975. On that occasion, she had parked her car facing away from a wall in a parking garage. She remembered that she had "put the car in Park and . . . press[ed] the emergency brake". When she "went to turn the key in the ignition . . . the car slammed into the back wall." Dave Pyles towed the car to its shop, inspected the transmission, and made repairs. Plaintiff was not satisfied that the problem had been corrected because the gear shift lever "had a little bit of play in it" and "the needle never quite went completely into 'P' ". She took the car back to the dealer "several times" and, on each occasion, the mechanics assured her, "Don't worry about it. Nothing's wrong with it." Following the accident out of which this suit arose, she took the car to a different mechanic who replaced a "grommet" or bushing in the transmission linkage. The grommet, which was located "right next to the column shift lever", was "split in two different pieces."

William H. Divine, a mechanical-electrical engineer, qualified as plaintiff's expert witness. Divine testified that, based upon his study of "the transmission linkages and . . . the adequacy of the pieces in the linkage", the system was "dangerous and unsafe". He explained that "the transmission is designed in a manner that a reasonable, prudent individual can be led to place the shift lever on the land between park and reverse".* Thus, the transmission

---

* The shift control mechanism employs a stamped metal "insert plate" mounted inside the steering column beneath the gear indicator. The edge of this plate has "detents" or notches which correspond with the several gears and modes printed on the gear indicator. The detents for park and reverse are separated by a raised surface called the "land". As a

could "have the appearance of . . . being in Park" when, in fact, it was not fully engaged, a phenomenon referred to at trial as the "illusory park position". In that position, vibration could cause the transmission to slip into reverse gear. It was Divine's opinion that plaintiff "did not truly put the transmission into Park" even though "[s]he thought she did". Divine believed that a split grommet could have caused "increased sloppiness" in the linkage and aggravated the risk of mispositioning the shift lever.

In the opinion of Robert Everson, one of Ford's expert witnesses, the transmission system in plaintiff's car "was not unreasonably dangerous for its intended use; in fact, it was safe for its intended use. It met the state of the art." He acknowledged that a driver, "through carelessness", might "put the tang up on the land", but he said that the same was true with respect to the automatic transmission systems in Chrysler and General Motors products. If such a car were parked on a grade, Everson stated, placing the transmission in illusory park would "have the same effect" as placing it in neutral, *i.e.,* if the emergency brake were not set, the car would start to roll if there were "[a]ny kind of force input; slamming the door or opening the door, shaking the car, putting groceries in and that sort of thing." Speaking of the split grommet, Everson said that "no single missing bushing in the linkage would cause you to not be able to get into park."

Plaintiff introduced as exhibits a number of Ford's interoffice communications. These documents showed that Ford had received numerous customer complaints concerning the illusory park problem. Ford's witnesses testified that they had investigated all reports and concluded that the cause of the problem was driver carelessness. Nevertheless, their engineers evaluated several proposals for design modifications and adopted one. Other proposals were rejected because experiments indicated that they would not reduce the risk of driver error. We will discuss these proposals in more detail later in this opinion.

---

driver moves the shift lever, a "tang" at the end of the lever moves across the land and lodges in the detent selected. A linkage system which runs down the inside of the steering column transmits this movement to the "rooster comb", a device containing detents which correlate to those on the insert plate. The expert witnesses agreed that it is mechanically impossible for such a transmission to "jump" out of park into reverse gear. The emergency park brake is designed to hold only when the transmission is in the park or neutral mode and to release when it is shifted to a powered gear, but Divine demonstrated that the brake would operate when the tang is placed on the land.

Ford's major contention on appeal, structured in several parts, is that the evidence was insufficient "to establish a prima facie case" of negligence and causal connection. Plaintiff cannot rely upon the testimony of her expert witness to support the verdict, Ford says, because his testimony "was speculative and not based on facts in evidence" and because it "contradicted [plaintiff's] own unequivocal testimony of facts within her knowledge." Even if the expert testimony is considered, however, Ford believes that the evidence fails to establish liability for negligence, breach of implied warranty, or failure to warn. Further, Ford argues that plaintiff is not entitled to recover because she "misused her vehicle and was contributorily negligent as a matter of law." Finally, Ford maintains that the trial court should have set aside the verdict and awarded a new trial on the ground the damage award was so excessive that it tainted the validity of the jury's liability verdict.

By assignments of cross-error, plaintiff attacks the trial court's rulings on punitive damages, remittitur, and certain other questions raised at trial.

## I. PRIMARY NEGLIGENCE

### (a) *Expert Opinion*

Ford's assignments of error do not challenge the credentials of plaintiff's expert witness or question the admissibility of his testimony. Rather, Ford's position is that Divine's opinion concerning the cause of the accident "has no probative value" because it was based on speculation rather than facts in evidence.

"The plaintiff's case," Ford contends, "depends upon Mr. Divine's analysis of the 'land' in the Ford transmission." Ford explains why it believes his analysis has no evidentiary merit. There was no evidence of "objective engineering standards governing the width of the land or any other aspect of transmission design" and "the jury was not given any objective measure to apply". Divine's opinion that Ford's design was "dangerous and unsafe" and "does not conform with what I consider to be . . . safe engineering standards" was based upon a comparison with the design in only one other automobile, an Oldsmobile, "without regard to what anyone else in the industry did." And, Ford complains, Divine "did not offer any test results to verify his theory."

As we read Divine's testimony, his analysis was not limited to the design of the land. In the course of his analysis, Divine studied instruction manuals and data compiled by the National Highway Traffic Safety Administration; consulted with other experts; experimented with the transmission systems in plaintiff's Lincoln, a Cadillac, and his own Ford automobile; observed mechanics as they disassembled transmission components; and disassembled one transmission with his own hands. Describing himself as an "application engineer", Divine repeatedly explained that his opinion was based upon the experiments he conducted and upon an analysis of the interrelationship of all the components of the transmission linkage system — "the shift lever to the insert plate to the steering column, on down to the rooster comb." The dimension of the land, he said, was only "one of the reasons" that "the design of the Ford transmission . . . encourages the prudent operator to have the selector lever tang wind up on the land between reverse and park."

To demonstrate the validity of his opinion, Divine used a mock-up of the Ford transmission system introduced as an exhibit. In the experiments he had conducted on automobiles, he had found that vibration could cause a tang placed on the land to slip into the reverse detent. In the presence of the jury, he placed the tang on the land and vibrated the exhibit. The demonstration confirmed the results of his extra-judicial experiments.

As Ford says, plaintiff introduced no evidence to show that Ford's design failed to satisfy "objective engineering standards". But the record indicates that safety standards for automatic transmission design had never been promulgated. Absent an established norm in the industry, it was a matter of opinion of trained experts what design was safe for its intended use.

Divine's opinion was that Ford's design was "dangerous and unsafe". The opinion of Ford's experts was otherwise. But the contradiction does not nullify the probative value of Divine's opinion. We believe that his opinion was based upon a proper foundation and that it was for the jury to determine what weight to accord his testimony.

### (b) *Rule In Massie* v. *Firmstone*

Yet, Ford maintains that plaintiff cannot rely upon Divine's theory of causation, *viz.,* that defective design had induced plaintiff not to shift fully into park, because plaintiff testified that the

car *was* in park. Invoking the rule in *Massie v. Firmstone,* 134 Va. 450, 114 S.E. 652 (1922), Ford says that plaintiff is bound by her testimony. We disagree.

The *Massie* doctrine is not to be read as a rule of thumb, categorical, absolute, and universally applicable. By definition, it applies only to "statements of fact" made by the litigant, to statements of facts "within his own knowledge", and to "the necessary inferences therefrom".
It does not apply to statements of opinion. . . .

*Baines v. Parker and Gladding,* 217 Va. 100, 104, 225 S.E.2d 403, 406-07 (1976).

■ Moreover, when a litigant-witness explains or clarifies an adverse statement, his testimony must be considered as a whole, "[a]nd it is generally for the jury to determine whether it will accept such explanation or clarification." *VEPCO v. Mabin,* 203 Va. 490, 494, 125 S.E.2d 145, 148 (1962).

■ Plaintiff testified on cross-examination that "[a]s far as I am concerned it was in park." This clarifies her earlier testimony. Plaintiff took her car out of gear, moved the shift lever toward the park indicator, and applied the emergency brake. Since the brake could not be engaged with the car in an operating gear, and since the car remained stationary, plaintiff *thought* the car was in park. Given the facts within her knowledge, she was justified in that impression. Her impression proved to be a misimpression, caused by a lack of knowledge of physical facts essential to an informed opinion. Plaintiff did not know what the experts knew. She did not know that it was mechanically impossible for the transmission to "jump" out of park into reverse. She was not aware that the emergency brake could function when the tang was on the land or that vibration could cause a tang resting on the land to slip from that position into reverse gear. Her testimony that she placed the car in park was not a statement of fact within her knowledge but an expression of opinion, and we hold that the rule in *Massie* does not apply.

■ In our view, plaintiff's testimony describing what happened and Divine's testimony explaining why it happened is sufficient to prove primary negligence and causal connection. But that testimony does not stand alone. Indeed, the testimony of Ford's own experts tends to strengthen plaintiff's proof of defective design.

Although Ford's officials abandoned proposals to redesign the transmission because they proved to be ineffectual, the testimony of Ford's experts, reinforced by interoffice communications, reflects their concern that the original design was a contributing cause of accidents reported by Ford drivers.

We are of opinion that the testimonial, documentary, and demonstrative evidence, considered as a whole, constitutes a preponderance of proof in plaintiff's favor. Specifically, we hold that the evidence fully supports the jury's findings that Ford's transmission was not safely designed for its intended use; that the design defect substantially enhanced the danger of misuse and personal injury by leading an ordinarily prudent driver into a false sense of security; and that plaintiff's injuries were the proximate result of Ford's negligence in design.

## II. MISUSE AND CONTRIBUTORY NEGLIGENCE

Standing alone, such findings are not enough to establish liability. A defendant is not liable if the plaintiff was guilty of negligence which proximately contributed to his injury, and "implied warranty does not apply when the product is being used in a manner . . . for which it was not intended." *Turner* v. *Manning, Etc.,* 216 Va. 245, 252, 217 S.E.2d 863, 869 (1975). Invoking these two rules without distinction, Ford argues that plaintiff cannot recover because she "misused her vehicle and was contributorily negligent as a matter of law." In particular, Ford says that Divine's testimony shows that, while "millions of drivers accomplish the task of shifting each day without any difficulty", plaintiff "misplaced [the shift lever] somewhere between 'park' and 'reverse' "; that she failed to "jiggle" the lever "to be sure that the car was fully in park"; that she left the motor running when she got out of the car; and that, but for such negligence, the accident "would not have happened".

Negligence, a breach of the duty of ordinary care under the circumstances, is a question of law only when it clearly appears that fair-minded jurors could not differ in resolving the question. Ford overlooks some of the facts and circumstances relevant to the question whether plaintiff exercised ordinary care in the use of her car. Even when the park gear was fully engaged, the gear indicator did not point directly to "P". Aware of that fact, an ordinarily perceptive observer might be deceived by what he saw. There was "a little bit of play" in the shift lever, and the

most dexterous operator might be unable to distinguish between "play" and a "jiggle". Plaintiff engaged the emergency brake, which was not designed to hold while the transmission was in a powered gear, and the car, positioned on a slope, remained stationary. Under such circumstances, it would not be an act of negligence for a driver to leave the motor running. Finally, whether plaintiff exercised ordinary care in the use of her automobile must be determined in light of the fact that she had been assured and repeatedly reassured by trained mechanics that her transmission was in proper working order.

Considering all the facts and circumstances, we agree with the trial judge that this was a jury question. And, since Ford does not challenge the court's instructions on this issue, we will not presume to substitute our judgment for that of the jury.

### III.  DENIAL OF NEW TRIAL

When the jury announced its verdict, Ford moved the court to set it aside and "grant a new trial on the issues of liability and compensatory damages" on the ground the damage award "was so excessive as to be shocking and compel the conclusion that the jury misconceived or misunderstood the facts, the law, or the Instructions of the Court." The trial court denied the motion but ordered a remittitur which plaintiff accepted under protest.

On appeal, Ford argues that the court should have applied the rule in *Rawle* v. *McIlhenny,* 163 Va. 735, 177 S.E. 214 (1934). There, a plaintiff moved to set aside a verdict on the ground the damage award was inadequate. The trial court granted the motion and ordered a new trial limited to damages. Summarizing the rules in five classes of cases, this Court said that when "the evidence warrants the inference that, instead of deciding the question of liability, the jury has arbitrarily determined to make both parties bear a part of the burden of the injury . . . [and] the court sets aside a verdict of this class, it should grant a new trial on all issues." *Id.* at 750, 177 S.E. at 221.

Obviously, when a plaintiff's damage award is so inadequate that it bespeaks a compromise verdict, the integrity of the jury's finding on liability is suspect, and the only just remedy is a trial *de novo. See Rome* v. *Kelly Springfield,* 217 Va. 943, 234 S.E.2d 277 (1977). The same is true when the damage award is inadequate and the court concludes that "the merits of the case as to liability appear not to have been reasonably well developed

upon the trial, or the question as to the amount of damages is not distinctly separable from the matters involved in the issue as to liability, or the evidence with reference to liability has probably exerted a material influence upon the jury in determining the amount of the verdict". *Rawle,* 163 Va. at 750, 177 S.E. at 221.

The rule applied in cases where the damage award is inadequate may also apply when the award is excessive. Thus, when the evidence does not preponderate in favor of either party and the damage award is so large that it appears to be solely the product of sympathy, the jury's finding on liability is impeached and the court should order a new trial on all issues. *Rutherford* v. *Zearfoss,* 221 Va. 685, 272 S.E.2d 225 (1980).

A trial *de novo* is not mandatory, however, when the monetary award, though out of proportion to the injuries suffered, is not so excessive as to compel the conclusion that the liability verdict was the product of sympathy for the plaintiff or bias against the defendant. In such case, if the evidence before the jury clearly supports its finding of liability, a trial judge has two options. He may put the plaintiff on terms to accept a remittitur in lieu of a new trial, Code § 8.01-383.1, or he may grant the defendant a new trial limited to damages, Code § 8.01-383. *Edmiston* v. *Kupsenel,* 205 Va. 198, 202, 135 S.E.2d 777, 780 (1964).

In determining whether an excessive damage award requires a new trial on all issues, a new trial limited to damages, an order of remittitur, or a judgment confirming the award, a trial judge is vested with broad discretion, and we will not reverse his ruling unless the record plainly shows an abuse of discretion.

In support of its argument that the excessive damage award was so great that it tainted the decision on liability, Ford charges that plaintiff's evidence and her attorney's opening argument were designed to persuade the jury that "Ford had made a cynical decision to sacrifice safety for profit." Ford insists that "where the issues of liability and damages were not clearly separable, it is unrealistic to assume that a jury which is carried away by emotion as to damages will be dispassionate as to liability."

The trial judge believed the issues were separable. "The award," he said, "is so out of proportion to the injuries suffered as to suggest that the award is not the product of a fair and impartial decision." But while the judge found that the jury's decision on the quantum of the award was disproportionate to the damages proved, he expressly ruled that "there is no reason to conclude

that an excessive damage award tainted the legitimacy of the jury's finding on liability."

The judge who conducted the trial was in a better position than we to make that determination, and, confined as we are to the printed record, we cannot say that his ruling denying Ford's motion was an abuse of discretion.

## IV. ASSIGNMENTS OF CROSS-ERROR

### (a) *Remittitur*

■ Addressing one of the issues raised by assignment of cross-error, plaintiff asks us to "reinstate the jury's verdict and enter final judgment" because, she contends, "the judge's remittitur was an abuse of his discretion".

> In determining whether a trial judge has abused the discretion vouchsafed to him by the statutes and the common law we must examine the grounds upon which he based his order of remittitur. . . .
>
> [W]hen it appears from the record before us that the trial judge made a finding that the verdict was plainly excessive and remittitur should be ordered and that, in reaching his conclusion, he considered factors in evidence relevant to a reasoned evaluation of the damages incurred and to be incurred, his order will not be disturbed on appeal if the recovery after remittitur bears a reasonable relation to the damages disclosed by the evidence. "Reasonableness" in this context is the standard by which the exercise of discretion must be tested in this Court.

*Bassett Furniture* v. *McReynolds,* 216 Va. 897, 911-12, 224 S.E.2d 323, 332 (1976) (footnote omitted).

■ The record before us shows that the trial judge first made a finding that "a $50,000 award in the instant case is excessive and unfair" and "shocks the conscience of the Court" and then expressly articulated the factors in evidence upon which he based that finding:

> [P]laintiff incurred medical expenses of $292.10; she suffered the pain and emotional trauma of the car rolling over her leg, her anguish over the safety of her infant, an ugly and severe bruise, and several years of occasional discomfort.

In addition she was inconvenienced in caring for her children and home. Plaintiff was not hospitalized, suffered no permanent injury and had no out of pocket expense other than the $292.10.

We believe that, in keeping with the rule in *Bassett Furniture,* the trial judge made a "reasoned evaluation of the damages" and that "the recovery after remittitur bears a reasonable relation" to those damages. Accordingly, we reject plaintiff's argument and her plea.

### (b) *Punitive Damages*

Plaintiff maintains that the trial court erred in striking her claim for punitive damages. She argues that Ford, although aware of the danger inherent in the design defect, rejected the corrective modifications suggested by its own engineers and issued no warning to its customers other than an instruction in the owner's manual, "Whenever the car is parked be sure the selector lever is in 'P' position." Such conduct, she says, was motivated by cost considerations and reflects "a conscious disregard of the rights of others." The trial judge found that "the evidence was to the contrary, that cost was not a factor, that that did not enter into the decision."

The record supports that finding. Ford did not ignore customer complaints about the transmission. It dispatched engineers to investigate. While Ford drivers generally acknowledged that the cause of the problem was "customer carelessness", the investigators recommended Ford consider design modifications. It was thought that the broad space required to print the letters of the word "park" on the gear selector indicator might cause a driver to think his car was fully in park when the needle pointed to any of the four letters. To minimize the risk of such a misimpression, Ford redesigned the indicator by eliminating the last three letters of the word.

Two other proposals were outlined in a document prepared by the head of Ford's Project Development Group. To further reduce the risk of driver negligence in manipulating the shift lever, his report suggested that the land be widened. This suggestion was analyzed but rejected because the experts agreed that "[t]he wider the land the more possibility it was, for the malfunction" and "it might provide a greater area to place the lever up on that

land, rather than putting it in the proper position." Ford conducted an experiment on another proposal. The land was tapered and sloped and the tang was chamfered. The theory was that such a design would make it impossible for a tang inadvertently placed on the land to remain there. But the experiment disproved the theory. The tang would not slide off the land because "two pieces of steel that are sheared and rubbing together . . . will just hang."

In support of her charge that cost considerations dictated Ford's design decisions, plaintiff relies solely upon two sentences at the foot of the Ford document: "Based on cost and vehicle tryout, we will determine if the first proposal is satisfactory. If this is satisfactory, the second proposal will not be pursued past the layout steps." According to plaintiff, this proves that cost was "the first priority". In our view, the fair import of that language is that one proposal would be tested first; that if the vehicle tryout proved satisfactory but the cost was high, the other proposal would be evaluated; and that, if both proposals proved satisfactory, the comparative costs would be a relevant consideration. Our construction is reinforced by the testimony of the author of the language: "The cost was never a factor when safety was involved," he said. "[A]nything that I thought was needed in the automobile was put in the automobile as long as it was under my control."

It is true, as plaintiff argued below, that a "conscious disregard of the rights of others" is "one of the standards of punitive damages." *See, e.g., Jordan v. Sauve and Koons,* 219 Va. 448, 247 S.E.2d 739 (1978). But we believe fair-minded jurors could not disagree with the trial judge's conclusion that "[a]t best, plaintiff established that defendant's corporate officers and employees erred in judgment resulting in simple negligence in design and negligent failure to correct or to warn." Consequently, we will uphold his ruling that plaintiff failed to carry her burden of showing that Ford "had made a decision that [was] wanton, willful, malicious or in conscious disregard of the rights of others."

Plaintiff also assigns cross-error to a ruling excluding certain written data offered to show that Ford's design was unsafe and to a ruling against an instruction defining an evidentiary presumption in her favor. In light of our holding that the evidence was sufficient to uphold the jury's finding of actionable primary negligence, we need not address these questions.

Finding no reversible error in the court below, we will affirm the judgment.

*Affirmed.*