COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges O'Brien, Ortiz and Lorish
Argued at Fredericksburg, Virginia


CORINNE WHITE LLEWELLYN

OPINION BY
v.        Record No. 0404-24-4          JUDGE LISA M. LORISH
JANUARY 21, 2025

DIANE WHITE FECHTEL, ET AL.


FROM THE CIRCUIT COURT OF FREDERICK COUNTY
William W. Eldridge IV, Judge

Bradley J. Moyers (Clark & Bradshaw, P.C., on briefs), for
appellant.

Stephen L. Pettler, Jr. (Harrison & Johnston, PLC, on brief), for
appellees.


This appeal involves a dispute over Corrine White Llewellyn's actions as co-trustee of

her mother Jane White's trust. Diane Fechtel, another daughter and trustee, sued Llewellyn on

behalf of herself, Jane, and other heirs alleging Llewellyn breached her fiduciary duties by

improperly borrowing trust assets and by distributing trust funds for personal use. The circuit

court granted Fechtel's motion for partial summary judgment, concluding that Llewellyn's

response to a particular interrogatory meant that there were no material facts in dispute about

whether she improperly borrowed over $70,000 from the trust. Construing Llewellyn's

interrogatory responses to her benefit, however, and in light of her responses to the amended

complaint, we find that Llewellyn disputed that she improperly borrowed trust assets. So we

agree with Llewellyn that the circuit court erred in granting partial summary judgment on this

basis.

The circuit court also granted the second partial motion for summary judgment finding Llewellyn admitted to breaching her fiduciary duties by improperly using approximately $235,000 of trust assets. Here, the court based its ruling on Llewellyn's responses to 8,984 requests for admission. Llewellyn repeatedly objected to these thousands of requests for admission as being in excess of what Rule 4:11(e) allowed, but the court found that they fit within the exception for requests related to the "genuineness" of documents. We agree with Llewellyn that nearly all of the requests for admission in this case were not about the genuineness of documents and that the court erred by granting summary judgment based on Llewellyn's attempted responses to improper requests. We reverse and remand.

BACKGROUND[1]

In 1996, Jane created the revocable Jane Angus White Living Trust "for the more orderly management of [her] affairs during [her] lifetime and for the benefit of others thereafter." Jane was named trustee.[2] The trust identified her daughters, Llewellyn, Fechtel, and the children of her son, Rolfe White, as contingent beneficiaries. The trust required trustees to pay any income generated by the trust to Jane or to "pay it as the Trustee may be directed in a writing signed by [Jane]." The trust permitted the income payments to be made via deposits into a bank account "in the name of the beneficiary alone." Trustees could not make loans to themselves. Jane, as grantor, reserved the rights to amend or terminate the trust agreement and also had the "right to withdraw any part or all of the principal of the Trust Estate" by written direction to a trustee. In

---

[1] "Under well-settled principles, we review the record applying the same standard a trial court must adopt in reviewing a motion for summary judgment, accepting as true those inferences from the facts that are most favorable to the nonmoving party, unless the inferences are forced, strained, or contrary to reason." *Stahl v. Stitt*, 301 Va. 1, 8 (2022) (quoting *Fultz v. Delhaize Am., Inc.*, 278 Va. 84, 88 (2009)). That standard requires us to view the record in the light most favorable to Llewellyn.

[2] Jane's husband was originally named as a co-trustee as well, but later removed.

March 2002, Jane appointed Llewellyn and Fechtel to serve along with Jane as co-trustees. In August 2018, Jane, through Fechtel as her power of attorney, removed Llewellyn as co-trustee and contingent beneficiary.

In 2019, Fechtel sued Llewellyn for breach of fiduciary duty. Fechtel alleged that Llewellyn failed to properly disburse the trust's income, comingled trust and personal property, and failed to act solely in the beneficiaries' best interests. Among other claims, Fechtel alleged that Llewellyn transferred funds from the trust's USAA Federal Savings Bank account into personal accounts at First Bank and Wells Fargo Bank that were held jointly by Llewellyn, her husband Ronald, and Jane and that funds from those personal accounts were used to pay the expenses of Llewellyn, Ronald, and their various businesses. In her answer, Llewellyn admitted that the trust "maintained the referenced USAA Account" and that "funds were transferred from the USAA Account to other accounts, at Jane's direction." But Llewellyn denied improperly borrowing trust assets or using trust assets to pay for personal expenses.

*A. The Interrogatories*

As part of discovery, Fechtel served Llewellyn with interrogatories. In her responses, Llewellyn identified financial accounts in which she maintained an ownership interest, including three Wells Fargo bank accounts: one jointly held by herself and Ronald, and two accounts jointly held by herself and Jane. Llewellyn admitted that "money was transferred from the USAA account to the Wells Fargo account each month from May 2017 until January 2018 to pay for Jane's care . . . [and] to pay for qualified tuition plans . . . for the benefit of Jane's grandchildren." She also conceded that she was "unaware of any written directions from Jane to any Trustee" at any time following March 20, 2002. Llewellyn did not admit that she was the one who transferred the funds, or that the account was exclusively made up of assets that came from the trust.

Fechtel moved the circuit court for partial summary judgment based on Llewellyn's response to Interrogatory 13. Interrogatory 13 asked Llewellyn to "identify each amount borrowed, the date(s) on which the borrowing occurred, the date(s) on which the borrowed funds are to be repaid, the rate of interest . . . and any and all collateral pledged to secure any borrowing," if she contended that she "borrowed funds from the Trust." Llewellyn responded that from March 2017 through March 2018, she and Ronald "borrowed approximately $74,877.80 for their own personal use from the joint Wells Fargo account, with the agreement with Jane that they would be repaid from monies held in escrow" and that "Defendant is currently unable to access any Trust assets to ascertain if anything was borrowed from those accounts."

Fechtel argued that Llewellyn admitted in this response that she "breached her fiduciary duties as Trustee of the White Trust by borrowing Trust funds for use by her and Ron in the amount of at least $74,877.80." Llewellyn countered that her response did not admit that she ever "use[d] trust funds for personal use." Since the Wells Fargo account was "not a trust account" and no undisputed evidence showed that "all funds in the Wells Fargo account were transferred trust funds," Llewellyn argued that her admission of borrowing from the account could not be taken as an admission of borrowing trust funds. The circuit court found that Llewellyn's response unequivocally answered the interrogatory, which asked whether she borrowed from the trust. Because Llewellyn's answer to the complaint admitted that at least "some funds were transferred from the USAA Account to the Wells Fargo Account," and borrowing from the trust for Llewellyn's own personal benefit would have violated both the White Trust Agreement and Virginia's Uniform Trust Code, the court granted summary judgment and ordered Llewellyn to pay Fechtel $74,877.80, plus $15,434.09 in interest.

Llewellyn then supplemented her answer to Interrogatory 13 and asked the court to reconsider its summary judgment decision. Again acknowledging that she borrowed $74,877.80 from the Wells Fargo account, her supplemental interrogatory response stated that she "did not intend to infer [sic] that the Wells Fargo account was a Trust account funded by Trust assets." Instead, Llewellyn stated that it was her understanding that "the Wells Fargo account was Jane's personal checking account that she could use freely as she saw fit and not subject to the mandates of the Trust or management by the Trustees." Llewellyn asserted that "[t]o the best of [her] knowledge," the Wells Fargo account was funded by Jane's personal assets, not trust assets, so any borrowing from the account was from Jane personally, not from the trust. The circuit court denied her motion.

*B. The Requests for Admission*

Fechtel also served Llewellyn with 8,984 requests for admission, spanning more than 1,000 pages. For each of the 446 banking transactions at issue, Fechtel asked Llewellyn to respond to 20 questions related to the transaction including whether: 1) the transaction occurred, 2) Llewellyn wrote and authorized the check, 3) the money came from trust assets, 4) Llewellyn or her husband used and benefited from the transaction, and 5) the transaction was not authorized by Jane in writing. The requests also asked Llewellyn to admit or deny legal conclusions, including that she or others were liable to the trust for those transactions and obligated to repay the trust. Llewellyn objected to requests beyond the first 30, arguing that they did not relate to the genuineness of documents and thus exceeded the limitation specified in Rule 4:11(e)(1).[3]

---

[3] "Unless all parties agree, or the court grants leave for good cause shown, no party may serve upon any other party, at any one time or cumulatively, more than 30 requests for admission, including all parts and subparts, that do not relate to the genuineness of documents." Rule 4:11(e)(1). "Leave to propound additional requests should be liberally granted in the interests of justice." *Id.*

When Fechtel moved the circuit court to evaluate the sufficiency of Llewellyn's responses and grant summary judgment, and Llewellyn moved to strike the requests, the court ordered Fechtel to provide copies, under Rule 4:11(a), of the documents relevant to requests for admission. The court later explained that this was so "they could properly go through the genuineness of the documents with regard to the questions on the request for admissions." The court also ordered Llewellyn to file her responses within 60 days of receiving the documents.

After Llewellyn filed new responses, noting a continuing objection to requests "beyond the 30 that [are] permitted under [Rule] 4:11(e)," the court held another hearing on Fechtel's renewed motion to determine the sufficiency of the discovery responses. Llewellyn, at this point acting *pro se*,[4] "again, at the hearing, orally raised the issue" that the number of discovery requests went beyond what Rule 4:11 allowed. The court ruled "again, as it had in prior hearings concerning this issue," that Rule 4:11(e)(1) "*excludes*, from the thirty, requests for admission related to the genuineness of documents" and that the Rule stated that a court "*shall not* limit the number of requests for admission" related to genuineness. The circuit court then ordered Fechtel to provide Llewellyn with a list of requests that she believed Llewellyn answered insufficiently and ordered Llewellyn to respond to those requests within 60 days of receiving Fechtel's list.

After Fechtel sent Llewellyn a list identifying thousands of insufficient responses, Llewellyn, *pro se*, objected again, arguing that the requests imposed an undue burden and were mostly "not related to 'genuineness.'" Llewellyn also submitted a new set of responses to the requests for admission posed by Fechtel which included "different responses to RFAs besides the ones included in the list" that Fechtel assembled. Fechtel argued that "[a] great number of the responses contain equivocations or do not address the substance of the request" or "have no

---

[4] Llewellyn's counsel moved to withdraw in January 2021 after responding to the discovery requests in November 2020.

response at all" and that they should all be deemed as admissions. And Fechtel again moved the circuit court for summary judgment. The circuit court found many requests unanswered or insufficiently answered and thus treated most of the requests as admitted. For example, the court found non-responsive denials stating "this was not a trust account" to requests asking Llewellyn to admit she wrote certain checks drawing money from bank accounts that Fechtel contended were funded by assets owned by the White Trust. Based on the deemed admissions to "improper uses of White Trust assets," the circuit court found that Llewellyn committed breaches of trust and granted Fechtel summary judgment totaling an additional $235,346.35, plus $68,243.99 in interest. The circuit court also ordered Llewellyn to pay Fechtel $150,000 in attorney fees for the cost of litigating the two judgments.[5] Llewellyn appeals.

## ANALYSIS

In granting the two motions for partial summary judgment, the circuit court concluded that there was no dispute of fact over whether Llewellyn breached her fiduciary duties as a trustee by using trust funds for personal use and by improperly borrowing money from the trust. The circuit court found that Llewellyn conclusively admitted through her response to Interrogatory 13 that she moved money from the USAA trust account to another account jointly owned and held by Jane and Llewellyn and that Llewellyn then loaned herself $74,877.80 of trust assets from that account. The court also found that—within Llewellyn's responses to the nearly 9,000 requests for admission—she admitted that other non-trust accounts where she was a co-owner were funded with trust assets and that Llewellyn paid for $235,346.35 personal expenses out of these accounts.

---

[5] By the time of the hearing on attorney fees, Llewellyn retained new counsel who again argued that summary judgment was improper because there were disputed issues of fact and that the court had erred by allowing nearly 9,000 requests for admission.

Llewellyn argued below, and continues to argue on appeal, that she did not admit to any of this. Instead, she maintains that she never acted as trustee and that Jane managed all of her own accounts and authorized the movement of funds from the USAA trust account to other accounts. Llewellyn also argues that she expressly denied any improper use of trust assets and that the court erred by allowing Fechtel to issue nearly 9,000 requests for admission.

"[S]ummary judgment is a drastic remedy, available only when there are no material facts genuinely in dispute." *Fultz v. Delhaize Am., Inc.*, 278 Va. 84, 88 (2009). When a court determines "that no genuinely disputed material facts exist," we review de novo the court's "application of law to the facts." *Shifflett v. Latitude Props., Inc.*, 294 Va. 476, 480 (2017) (quoting *Mount Aldie, LLC v. Land Tr. of Va., Inc.*, 293 Va. 190, 196-97 (2017)). "If it appears from the pleadings, the orders, if any, made at a pretrial conference, the admissions, if any, in the proceedings, that the moving party is entitled to judgment, the court shall grant the motion [for summary judgment]." Rule 3:20.

Summary judgment is not appropriate, however, unless the moving party establishes the "facts to the degree that reasonable men should not differ in their opinions as to the reasonable inferences and the proper conclusions to be drawn from the evidence." *King v. Bondurant Dev. Corp.*, 227 Va. 206, 208 (1984). "Thus, if the evidence is conflicting on a material point or if reasonable persons may draw different conclusions from the evidence," summary judgment should not be granted. *Fultz*, 278 Va. at 88. In determining whether the evidence is conflicting, the circuit court "must consider inferences from the facts in the light most favorable to the non-moving party." *Andrews v. Ring*, 266 Va. 311, 318 (2003). Courts must be "mindful not to invade the province of the fact finder, whose role it is to resolve 'any inconsistencies and discrepancies.'" *W. Refin. Yorktown v. County of York*, 292 Va. 804, 826 (2016) (quoting *TransiLift Equip., Ltd. v. Cunningham*, 234 Va. 84, 93 (1987)).

A.  The Court erred in granting partial summary judgment based on Llewellyn's response to Interrogatory 13.

Interrogatories are written questions that may be directed to any other party in a lawsuit. Rule 4:8(a).  Answers to interrogatories may be used to help a party discover information and evidence, but they also "may be used to the extent permitted by the rules of evidence and for the purposes of Rule 3:20," which allows motions for summary judgment.  Rule 4:8(e).  Without question, interrogatories are part of the record that a court may review in determining whether summary judgment is appropriate.  *Klaiber v. Freeman Assocs.*, 266 Va. 478, 484 (2003).

But "[u]nlike binding admissions made pursuant to Rule 4:11(b), discovery depositions and answers to interrogatories generally do not conclusively bind a party." *Transilift Equip., Ltd.*, 234 Va. at 93; *see also Clifton v. Gregory*, 212 Va. 859, 861 (1972) (holding that an answer to an interrogatory "did not constitute an admission").  Interrogatory responses cannot be viewed in isolation.  Indeed, "a litigant-witness has the right to explain or clarify his testimony, including previously entered deposition statements and interrogatory answers." *Transilift Equip., Ltd.*, 234 Va. at 93.  "[W]hen a litigant-witness explains or clarifies an adverse statement, his testimony must be considered as a whole, '[a]nd it is generally for the jury to determine whether it will accept such explanation or clarification.'" *Ford Motor Co. v. Bartholomew*, 224 Va. 421, 431 (1982) (second alteration in original) (quoting *VEPCO v. Mabin*, 203 Va. 490, 494 (1962)).

The court granted partial summary judgment based on Llewellyn's original response to Interrogatory 13, which asked:

> If you contend you have borrowed funds from the Trust, please identify each amount borrowed, the date(s) on which the borrowing occurred, the date(s) on which the borrowed funds are to be repaid, the rate of interest (if any) charged for borrowed funds, and any and all collateral pledged to secure any borrowing.

Llewellyn's original response follows:

> ANSWER:
>
> During the time period from March 2017 through May 2018, Ron and Corinne borrowed approximately $74,877.80 for their own personal use from the joint Wells Fargo account, with the agreement with Jane that they would be repaid from monies held in escrow by Alfred "Chip" White, Esquire, in Front Royal, Virginia. Defendant is currently unable to access any Trust assets to ascertain if anything was borrowed from *those accounts*.
>
> During the relevant time period, Corinne, Ron, Diane, and Diane's husband, Albert T. Fechtel, jointly borrowed approximately $23,047.35 for repairs to real estate commonly known as 811 N. Royal Avenue, Front Royal, Virginia 22630.

(Emphasis added). Based on this response, and Llewellyn's admission elsewhere that at least some trust funds had been moved to the Wells Fargo account,[6] the circuit court concluded that Llewellyn conclusively admitted that she borrowed $74,877.80 from trust assets.

Considering only Llewellyn's original response, in the light most favorable to her, we find that "reasonable persons may draw different conclusions" about whether Llewellyn admitted to borrowing trust assets. *Fultz*, 278 Va. at 88. In response to whether she "borrowed funds from the Trust," Llewellyn stated that she borrowed money from "the joint Wells Fargo account" and that she was "unable to access any Trust assets to ascertain if anything was borrowed from those accounts." Elsewhere in her interrogatory responses, Llewellyn identified the joint Wells Fargo account as one co-owned by Jane and herself. Fechtel never contended that this Wells Fargo account was a Trust account, instead alleging that Llewellyn improperly transferred money from the USAA trust account to this Wells Fargo account because the trust agreement only permitted a trustee to move funds into an account if it was solely owned by Jane. Thus,

---

[6] Llewellyn admitted in her answer to the complaint that the trust "maintained the referenced USAA Account" and that "funds were transferred from the USAA Account to other accounts, at Jane's direction."

when Llewellyn admitted to borrowing assets from the Wells Fargo account, Fechtel argued that she was improperly borrowing trust assets.

Llewellyn's original response could be understood to admit Fechtel's theory of the case—that Llewellyn effectively borrowed funds from the trust when she borrowed from the joint Wells Fargo account that she improperly filled with trust assets. But a reasonable person might also read the response as admitting only to borrowing funds from the Wells Fargo account while disclaiming any knowledge about what funds were included in the Wells Fargo account or any responsibility for how the funds got into the account. Indeed, Llewellyn's defense (as expressed in other interrogatory responses and answers to the complaint) is that Llewellyn never acted as a trustee and that "Jane, both individually and as Trustee of the White Trust, maintained her own bank accounts and kept her own checkbook" and that "Jane always spoke directly with USAA to authorize" any transactions. Given this, Llewellyn's answer to the complaint denied that she improperly borrowed trust assets or using trust assets to pay for personal expenses.

Ultimately, however, we are left with more than Llewellyn's original response to this interrogatory. After the court granted partial summary judgment based on this response, Llewellyn, *pro se*, submitted a supplemental answer stating:

> I do not believe I borrowed any money from the Trust assets, with the possible exception of the 811 North Royal Avenue transactions which are described in the last several paragraphs of this response. The Trust assets, to the best of my knowledge, were investments handled first by Morgan Stanley/Dean Witter, then by Merrill Lynch and now by USAA. It is also my understanding that these investments drew income that was placed in the USAA account. Jane paid taxes on this income as the income was hers. As stated previously, Jane White was the account owner at USAA and was the only one who could authorize transfers in and out of that account.

Llewellyn explained that her original response in which she stated she borrowed $74,877.80 from the joint Wells Fargo account remained true and that she simply "was trying to be open

about borrowing money from Jane White, but I did not intend to infer [sic] that the Wells Fargo account was a Trust account funded by Trust assets." She maintained that the Wells Fargo account was "a continuation of Jane's . . . personal checking account." Llewellyn asked the court to reconsider its grant of summary judgment based on this supplemental response. The court denied the motion to reconsider.

Fechtel argues that the supplemental response cannot change the outcome because it "sought to undo an established judicial admission which had already been relied upon." We agree it would be improper for a party to change tack and attempt to manufacture a disputed issue of fact after the court granted summary judgment. Summary judgment "would be greatly diminished as a mechanism for screening out frivolous issues of fact if a party could create a factual dispute simply by presenting an affidavit contradicting his prior testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). But here, Llewellyn did not change her prior response, or try to introduce new evidence. Her *pro se* supplemental response merely added additional explanation that was entirely consistent with her prior admissions and highlighted the disputed factual issue.

For these reasons, we disagree with the circuit court that Llewellyn can be said to have conclusively admitted to improperly borrowing trust assets based on her interrogatory response, in light of the full record before us. Whether Llewellyn's different assertions are true, whether her explanation of what funds were borrowed is credible, and the question of who moved the funds, are all matters over which reasonable persons could "draw different conclusions." *Fultz*, 278 Va. at 88. Thus, those are questions properly left to a jury to answer. *W. Refin. Yorktown*, 292 Va. at 826.[7]

---

[7] The circuit court concluded that borrowing assets from a personal account was a breach of the trust agreement if the assets were formerly trust assets moved in violation of the trust

B. The court erred in granting partial summary judgment based on Llewellyn's responses to nearly 9,000 requests for admission, the vast majority of which were improper under Rule 4:11.

Llewellyn assigns error to the circuit court's decision to allow the voluminous requests for admission as requests relating to the genuineness of documents,[8] as well as the court's decision to grant summary judgment based on her responses to improper requests. We review a court's decisions on discovery matters for an abuse of discretion. *See, e.g.*, *Temple v. Mary Washington Hosp., Inc.*, 288 Va. 134, 139 (2014) (affirming that rulings on the grant or denial of discovery requests are reviewed for an abuse of discretion). A "court by definition abuses its discretion when it makes an error of law." *Lynchburg Div. of Soc. Servs. v. Cook*, 276 Va. 465, 484 (2008) (quoting *Porter v. Commonwealth*, 276 Va. 203, 260 (2008)). We review de novo a court's "application of law to the facts" in granting a motion for summary judgment. *Shifflett*, 294 Va. at 480.

As part of the discovery process, a party may "serve upon any other party a written request for the admission . . . of the truth of any matters . . . that relate to statements or opinions of fact or of the application of law to fact, including the genuineness of any documents." Rule 4:11(a). A request "is admitted unless . . . the party to whom the request is directed serves upon the party requesting the admission a written answer or objection." *Id.* "If objection is made, the reasons . . . must be stated" and "the answer must specifically deny the matter or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter." *Id.* If the

---

agreement. Because we conclude there are disputed issues of fact in any event, we do not interpret the trust agreement or Virginia's Uniform Trust Code on this point.

[8] Fechtel claims that Llewellyn failed to preserve her objection to the number of requests, but Llewellyn objected in writing each of the three times she responded to the requests, and raised the issue again at every hearing. These objections preserved her argument for appellate review. Rule 5A:18.

court finds that an answer does not comply with Rule 4:11, "it may order either that the matter is admitted or that an amended answer be served." *Id.*

Without agreement or leave of court, "no party may serve upon any other party . . . more than 30 requests for admission." Rule 4:11(e)(1). That said, "[t]he number of requests for admissions relating to the genuineness of documents will not be limited." Rule 4:11(e)(2). The Rule allows for an unlimited number of requests about the genuineness of documents to allow parties to "stipulate in advance to the authentication of evidence under Rule 4:11(a)" with the ultimate effect of "'streamlin[ing] [the] presentation of proof at trial.'" *Lorenz v. Parker*, 82 Va. App. 413, 423 (2024) (second alteration in original) (quoting 1 Kent Sinclair, *Virginia Civil Procedure* § 12.13 (Lexis 2024)). In other words, a request about the genuineness of a document is necessarily linked to the authentication of that document for purposes of admission at trial. It is in this way that "[a]n admission that 'there is no issue as to the genuineness or foundation of planned exhibits' has the effect of 'speeding and easing the presentation of those exhibits at the trial.'" *Id.* at 424 (quoting 1 Sinclair, *supra* § 12.13). *See also Genuine*, *Black's Law Dictionary* (11th ed. 2019) (defining genuine as "authentic or real; having the quality of what a given thing purports to be or to have").

In total, Fechtel propounded 8,984 requests for admission to Llewellyn. Of these requests, 8,920, including subparts, concerned 446 identified financial transactions. We set forth Request 337 in its entirety as an example of the scope of the discovery that Fechtel propounded about each transaction.

First Bank – 1203 – 08/20/15 –09/01/15 – Jackie Roberts – 276.00

a. Please admit that Check Number 1203 in the amount of $276.00 was written from the First Bank Account to Jackie Roberts on August 20, 2015.

RESPONSE:

b.  Please admit that you wrote Check Number 1203 in the amount of $276.00 from the First Bank Account to Jackie Roberts on August 20, 2015.

RESPONSE:

c.  Please admit that you authorized Check Number 1203 in the amount of $276.00 to be written from the First Bank Account to Jackie Roberts on August 20, 2015.

RESPONSE:

d.  Please admit that the money used to fund Check Number 1203 in the amount of $276.00 written from the First Bank Account to Jackie Roberts on August 20, 2015 was transferred to the First Bank Account from assets owned by the White Trust.

RESPONSE:

e.  Please admit that, at the time money used to fund Check Number 1203 in the amount of $276.00 written from the First Bank Account to Jackie Roberts on August 20, 2015 was transferred to the First Bank Account from assets owned by the White Trust, you were Trustee of the White Trust.

RESPONSE:

f.  Please admit that you and Ron or one of your affiliated entities received the benefit of the funds paid for a Check Number 1203 in the amount of $276.00 written from the First Bank Account to Jackie Roberts on August 20, 2015.

RESPONSE:

g.  Please admit that you do not possess or otherwise have access to any documentation referring or relating to Check Number 1203 in the amount of $276.00 written from the First Bank Account to Jackie Roberts on August 20, 2015.

RESPONSE:

h.  Please admit that you do not possess or otherwise have access to any documentation referring or relating to money transferred to the First Bank Account from assets owned by the White Trust to fund payment of a Check Number 1203 in the amount

of $276.00 written from the First Bank Account to Jackie Roberts on August 20, 2015.

RESPONSE:

i.  Please admit that there are no written directives from Jane authorizing the issuance of Check Number 1203 in the amount of $276.00 written from the First Bank Account to Jackie Roberts on August 20, 2015.

RESPONSE:

j.  Please admit there is no written agreement evidencing the terms upon which the funds paid for Check Number 1203 in the amount of $276.00 written from the First Bank Account to Jackie Roberts on August 20, 2015 are to be repaid.

RESPONSE:

k.  Please admit that Ron was aware that the money used to fund Check Number 1203 in the amount of $276.00 written from the First Bank Account to Jackie Roberts on August 20, 2015 came from assets of the White Trust.

RESPONSE:

l.  Please admit that the funds paid by Check Number 1203 in the amount of $476.00 [sic] written from the First Bank Account to Jackie Roberts on August 20, 2015 came from assets of the White Trust were used by you for your own personal use or for the benefit of companies in which you and/or Ron owned interests.

RESPONSE:

m.  Please admit that the funds paid by a Check Number 1203 in the amount of $276.00 written from the First Bank Account to Jackie Roberts on August 20, 2015 came from assets of the White Trust have not been repaid to the White Trust.

RESPONSE:

n.  Please admit that the funds paid by Check Number 1203 in the amount of $276.00 from the First Bank Account to Jackie Roberts on August 20, 2015 have not been repaid to the [sic] Jane.

RESPONSE:

o. Please admit that you are obligated to repay the White Trust for the funds paid by a Check Number 1203 in the amount of $276.00 written from the First Bank Account to Jackie Roberts on August 20, 2015.

RESPONSE:

p. Please admit that you are obligated to repay Jane for the funds paid by paid by a [sic] Check Number 1203 in the amount [sic] $276.00 written from the First Bank Account to Jackie Roberts on August 20, 2015.

RESPONSE:

q. Please admit that Ron is obligated to repay the White Trust for the funds paid by Check Number 1203 in the amount [sic] $276.00 written from the First Bank Account to Jackie Roberts on August 20, 2015.

RESPONSE:

r. Please admit that Ron is obligated to repay Jane for the funds paid by Check Number 1203 in the amount of $276.00 written from the First Bank Account to Jackie Roberts on August 20, 2015.

RESPONSE:

s. Please admit that any of the Llewellyn entities who benefited from the funds paid by Check Number 1203 in the amount of $276.00 written from the First Bank Account to Jackie Roberts on August 20, 2015 are obligated to repay the White Trust.

RESPONSE:

t. Please admit that any of the Llewellyn entities who benefited from the funds paid by Check Number 1203 in the amount of $276.00 written from the First Bank Account to Jackie Roberts on August 20, 2015 are obligated to repay Jane.

RESPONSE:

The court erred as a matter of law by concluding that each request about these financial transactions was about the authenticity of documents. To the contrary, these requests sought admissions about how or why various transactions occurred; the original source of the funds

involved in the transactions; who received the funds; the purpose of the transactions; and whether Llewellyn or others were liable to the trust for the amounts involved in those transactions. Propounding nearly 9,000 requests for admission related to contested factual and legal matters—rather than a proffered document's authenticity—violates the prohibition in Rule 4:11(e)(1), which limits such requests "including all parts *and subparts*," (emphasis added), to a cumulative total of 30. The rule expressly prevents a litigant from evading the limitation on the number of requests for admission by styling questions that do not relate to the authenticity of documents as subparts of a question that does.

The circuit court, therefore, abused its discretion by concluding that thousands of these requests fell within the "authenticity" exception to Rule 4:11(e)(1). The court made no finding of good cause[9] to otherwise allow the requests, so the thousands of requests for admission that did not relate to the genuineness of any documents were all improper under Rule 4:11.

Then, compounding this error, the circuit court determined that Llewellyn admitted the misuse of trust assets regarding 56 transactions where her attempted denials were insufficient or non-responsive with respect to subpart (d) of the requests for admission concerning each of the transactions and then relied on those admissions to grant summary judgment.[10] Subpart (d) of each request asked Llewellyn to admit that the *source* of the money used to fund each of the

---

[9] Rule 4:11(e) allows a party to issue more than 30 requests for admission if the court grants leave for good cause shown.

[10] After filing her responses to the requests for admission (while still represented by counsel), the court deemed many insufficient and ordered Llewellyn (then *pro se*) to file sufficient responses to each of the requests Fechtel identified as lacking. Llewellyn's later attempt at supplementing her requests is not in the record before us, but it is clear from the transcript of the hearing where the court considered her responses that Llewellyn never answered subpart (d) with "Admit" and instead either failed to respond at all because no documentation was provided about the transaction in question or responded with a denial explaining that the transaction in question was from an account that was "not a trust account."

questioned transactions was transferred to those accounts from assets originally held in trust. So these requests were not about the genuineness of any document.

Because these requests for admission exceeded those allowed under the rules of evidence, the court erred by deeming Llewellyn's responses to be admissions and granting summary judgment on that basis.[11] When Llewellyn's responses are excluded, there are plainly disputed facts that must be decided at trial.[12] "The purpose of Rule 4:11 is to expedite a trial by narrowing the contested facts and issues, but the rule should not be used as a weapon 'with the wild-eyed hope that the other side will fail to answer and therefore admit essential elements.'" *Shaheen v. Cnty. of Mathews*, 265 Va. 462, 475 (2003) (quoting *Perez v. Miami-Dade County*, 297 F.3d 1255, 1268 (11th Cir. 2002)).

We reverse the circuit court's grant of summary judgment against Llewellyn for breach of trust in the amount of $235,346.35, plus $68,243.99 in prejudgment interest. And because we reverse the grants of summary judgment, we also reverse the court's decision to award Fechtel $150,000 in attorney fees.

---

[11] We note that federal courts have disregarded requests for admission and their attendant responses when the requests exceed the scope of Federal Rule of Evidence 36. *See, e.g.*, 7 Moore's Federal Practice – Civil § 36.03 ("Only 'proper' requests are deemed admitted . . . .").

[12] Llewellyn also argues that—even if her responses to subparts (d) of the requests for admission should be considered—the court erred in granting summary judgment because she did not admit to misusing trust funds and has elsewhere denied that she moved money from the USAA trust account to the other accounts and maintained that Jane managed her own trust and accounts. We do not reach this issue here because we reverse on other grounds.

CONCLUSION

For these reasons, we reverse the circuit court's grants of partial summary judgment and

award of attorney fees and remand the case for further proceedings consistent with this opinion.[13]

*Reversed and remanded.*

---

[13] Fechtel requests appellate attorney fees under Rule 5A:30(b)(1). We deny Fechtel's motion because she has not prevailed on appeal. We also deny Llewellyn's motion to sanction Fechtel for the discovery violation, without prejudice to Llewellyn's right to ask the circuit court to address the matter on remand.